FILED

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 JAN 31 P 4: 57

U.S. DISTRICT COURT
DISTRICT OF MASS.

————————————————————— )
                                                    )
DANIEL P. WARD,                                     )
                                                    )
        Plaintiff,                                  )
                                                    )
v.                                                  )    CIVIL ACTION NO. 03-12281-RCL
                                                    )
VERIZON CORPORATION and                             )    **ORAL ARGUMENT REQUESTED**
MICHAEL B. SHEA,                                    )
                                                    )
        Defendants.                                 )
————————————————————— )


## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


**VERIZON NEW ENGLAND INC.**
and **MICHAEL B. SHEA**

By their attorneys,

Arthur G. Telegen (BBO # 494140)
David C. Kurtz (BBO # 641380)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: January 31, 2005

Defendants Verizon New England Inc. ("Verizon")[1] and Michael B. Shea ("Shea")
respectfully submit this memorandum of law in support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Daniel P. Ward ("Ward") was employed by Verizon and its predecessors
(collectively, "Verizon") for over twenty years until his termination on March 12, 2003. Ward's
termination closed the door on a long, but checkered Verizon career, replete with multiple
suspensions, warnings and discipline for poor performance, productivity and quality. In his final
months, Ward had been placed on a Performance Improvement Plan, aimed at improving his
unacceptable performance in his new managerial position. If a review of his performance
through February 3, 2003 did not show marked improvement, Ward would be subject to
termination. Despite being provided with this final opportunity, Ward's performance continued
to be unacceptable. Verizon and Shea, however, never formally reviewed Ward's performance
or determined whether or not to terminate him. Instead, Ward left work and failed to inform his
supervisor as to his employment status, or whereabouts, for at least 9 days in March 2003. After
significant, but unsuccessful efforts to contact Ward, Verizon terminated his employment
effective March 12, 2003 due to job abandonment.

Ward disagrees with Verizon's decision to terminate him, and believes that his
termination was both discriminatory and retaliatory. His Complaint frames this disagreement as
a three-count lawsuit against Defendants. Each count fails:

1.      Ward's claim under M.G.L. Chapter 151B for race discrimination against
Defendants fails because he cannot make out a prima facie case due to his poor performance.

---

[1]  The Complaint incorrectly identifies Verizon Corporation as Ward's former employer. The Company should be
referred to as Verizon New England Inc.

Nor can he establish that the legitimate, non-discriminatory reason proferred for his termination is a pretext for discrimination.

      2.     Ward's claim for retaliation under Chapter 151B fails because he cannot establish any causal connection between his complaints of race discrimination and his termination which followed nearly nine and one-half months later.  Nor can he establish pretext.

      3.     Ward's claim for retaliation under the Family and Medical Leave Act ("FMLA") fails because he cannot establish any causal connection between his FMLA leave and his termination.  Nor can he establish pretext.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**I.**      **Ward's Verizon History.**

      Ward, an African-American male, was employed by Verizon for 20 1/2 years until his termination on March 12, 2003.  Complaint, ¶ 5; Deposition of Daniel P. Ward ("Ward Dep.") Ex. 29.[2]  Between 1991 and 2001, Verizon formally and informally disciplined Ward for a wide variety of performance deficiencies, including failure to complete tasks, excessive time on jobs, insufficient customer contact, rudeness towards customers, poor performance and poor quality.  Ward Dep. Exs. 2-13.  Verizon utilized several disciplinary methods to address those deficiencies, including suspensions, verbal warnings, written warnings, letters of discipline and contact memoranda.  Id.

      Several of Ward's formal reviews during that ten year period reflected his performance deficiencies.  In January of 1997, Ward received a written appraisal of his performance as a Splice Service Technician ("SST") for the year 1996.  He was rated "Below Requirements" ("BR") in one of four categories:  "Quality," due to insufficient accuracy, thoroughness,

---

[2]  All pleadings, transcripts and exhibits referred to herein are attached to the Affidavit of David C. Kurtz filed herewith.

accountability and attention to detail in his work assignments. Ward received an overall rating of BR for 1996. Defendant Verizon New England, Incorporated's Answers and Objections to Ward's First Set of Interrogatories ("Deft's Ans. to Ints."), Ans. No. 5, pp 5-6.

In February of 1998, Ward received a written appraisal of his performance as a Splice Service Technician ("SST") for the year 1997. He was rated "Below Target" ("BT") in one of four categories: "Quality," due to insufficient accuracy, thoroughness, accountability and attention to detail in his work assignments. Ward received an overall rating of "Needs Development" ("ND") for 1997. Id. at pp. 6-7.

On February 23, 2000, Ward received a written appraisal of his performance as manager for the year 1999, along with an oral review. He was rated "Improvement Needed to be Effective" ("IN") in two of 7 categories: "Communication", due to poor listening skills and an inability to convey directions clearly; and "Leadership and Development of Employees", due to poor leadership skills. Id. at p. 7.

On March 14, 2001, Ward received a written appraisal of his performance as manager for the year 2000, along with an oral review. He was rated IN (Improvement Needed) in two of twelve categories: "Meet or Exceed the incurred expense budget", due to high absence rates among his technicians; and "Leadership and Development of Employees," due to his failure to create an atmosphere of inclusion. Id. at p. 7; Ward Dep. Ex. 14. His overall rating, however, was EM (Exceeds/Meets Position Requirements). Ward Dep. Ex. 14.

## II.    Ward Becomes a Manager in the Special Service Group.

Despite his poor disciplinary record and mediocre reviews as an hourly technician, Verizon nonetheless provided Ward with advancement opportunities. In early 2001, Ken MacDonald, a manager in the Wholesale Operations group, recommended that Ward be

promoted to a supervisory position. Deposition of John Reed ("Reed Dep.") at 7-8. John Reed, Director of Wholesale Operations, the same manager who ultimately discharged Ward in March 2003, approved MacDonald's recommendation and, in or about March 2001, named Ward a manager in the Special Service Group. Id.; Ward Dep. at 39.

The Special Service Group installed and maintained special service equipment, such as circuits and cards. Ward Dep. at 39. In addition, the employees in the Special Service Group installed and maintained radio circuits and installed and maintained CLEC (Competitive Local Exchange Carrier) services. Id. at 40-41.

In or about April 2001, approximately one month after Ward joined the Special Service Group, Michael Shea became his supervisor. Id. at 41, 49. Shea served as Area Manager for the Wholesale Department and was charged with overall responsibility for the Special Services Group. Id. at 50; Deposition of Michael Shea ("Shea Dep.") at 6. Ward worked for the remainder of his Verizon employment under Shea's supervision. Ward Dep. at 43.

Ward supervised approximately 15 Special Service Technicians as a manager in the Special Service Group. Ward Dep. at 44-45. His responsibilities included supervising the technicans' activities and ensuring that they were abiding by Verizon standards in performing their duties. Ward Dep. at 47. His job was more difficult than his previous job, requiring him to supervise fifteen employees who traveled about performing services for customers, as opposed to nine employees who all worked at one location. Ward Dep. at 47-49.

Sometime in mid-2001, when Shea was critical of Ward's work, Ward alleged that Shea's treatment of him was racially motivated. Ward Dep. at 115. Initially, he reached that conclusion because a mid-year review issued to him "had all these negative things in there, very

opinionated stuff." Ward Dep. at 116. Ward had similarly concluded that a previous manager who had critiqued his performance was racially motivated. Id. at 25.

### III.    The Kyller/Cogavin/Lyons Incident.

In or about November 2001, Ward had a confrontation with two of the technicians in his group, James Kyller and James Cogavin. Ward Dep. at 68-70, 77. When Ward challenged them about their performance on a job, they allegedly said "some really lousy things" to him. Id. at 78. Although they may have used expletives, there was no racial content. Id. at 81. In addition, Mr. Kyller allegedly attempted to trip Ward with a wire. Id. at 78-79. Ward, however, did not seek to discipline them. Id. at 84. That same day, Union Steward Steve Lyons allegedly screamed at Ward regarding the confrontation between Ward and Kyller/Cogavin. Id. at 86-87. Lyons allegedly referred to Daniel Ward as "Danny Boy" during his tirade. Id. at 94. Ward believed, however, that none of Lyons' words toward him were racially-related. Id. at 88-89.

Nevertheless, Shea, Ward's manager, was concerned about the possible racial implications of Lyons' behavior. Shea contacted Verizon EEO Officer Paul McGovern regarding Ward's discussion with Lyons, because Shea believed that Lyons' alleged use of the term "Danny Boy" was inappropriate and, perhaps discriminatory. Shea Dep. at 23-25. McGovern initiated an investigation, and, ultimately found no discriminatory conduct by Lyons. Id. at 25-26.

### IV.    Ward's Relationship With Shea.

On March 13, 2002, Ward received a written appraisal from Shea of his performance as manager for the year 2001, along with an oral review. He was rated Improvement Needed ("IN") in three of four categories:  "Customer Focus," due to his failure to deliver quality products and services; "Leadership Focus," due to poor leadership skills; and "Results Focus,"

due to his failure to improve as a manager. Ward received an overall appraisal of IN for 2001. Ward Dep. Exs. 16, 18. Ward disagreed with the poor review. Ward Dep. at 117-18 and Ex. 16. In the comment section of the review, he wrote: "I'm not sure if I agree with this." Ward Dep. Ex. 16. He did not, however, file any immediate complaint.

On May 23, 2002, Ward and Shea allegedly met in Shea's office to discuss a proposed Reduction-in-Force in their department. Ward Dep. Ex. 21. Allegedly, Shea informed Ward at the meeting that he was Shea's "poorest performer last year" and concluded by saying, "You suck; you're lucky to have a job." Ward Dep. at 111 and Ex. 21. That day, Ward called Verizon EEO Officer McGovern to complain about Shea. Ward Dep. Ex. 21.

Thereafter, on May 29, 2002, Ward sent McGovern a follow-up letter claiming that Shea not only treated him more harshly than his peers, but undeservedly so because Ward was in fact outperforming his peers. Ward Dep. Ex. 21. With respect to his discrimination claim, Ward wrote, "as a person of color, I feel that I have been singled out and treated different from other managers in my department. Somehow, I am being held to a higher standard than they are." Id.

McGovern investigated Ward's claim of discrimination. Shea Dep. at 27. As part of his investigation, he interviewed Shea, and requested documentation on any less than satisfactory management appraisals on any other employees managed by Shea, sought information regarding other minorities on Shea's team, and asked for names of people who could substantiate or refute Ward's claims. Id. at 27. After a full investigation, McGovern contacted Ward to inform him that he had concluded his investigation, and that he had identified no evidence of discrimination in Shea's reviews or treatment of Ward. Def't's Ans. to Ints., Ans. No. 9, p. 14.

Although Ward accuses Shea of discrimination, he admits that Shea never said anything to him containing a racial epithet or stereotype. Ward Dep. at 116-17. In fact, the only incident

between Shea and Ward that relates to race is Shea's response to the Lyons incident.

Nonetheless, he believes that Shea had a racist attitude toward him because of "the way he talked

down to [him], the way he treated [him] altogether from the beginning, the way he treated

others." Ward Dep. at 117. For instance, he testified that Shea (1) favored other, unspecified

managers (id. at 100); (2) referred to him as "Daniel" instead of "Dan", which he prefers (id.);

(3) shut him out from overtime and flex time opportunities, although he never sought them (id. at

100-04); (4) "talked down" to him (id. at 105-06); and (5) screamed at him and threatened to

suspend him or send him home (id. at 106-07).

## V.    The Performance Improvement Plan.

On July 18, 2002, Verizon placed Ward on a Personal Improvement Plan ("PIP"). Ward

Dep. at 114-15 and Ex. 19. Through a PIP, Verizon informs underperforming employees of the

deficiencies in their work, and provides them with specific goals for improving those

deficiencies. Ward Dep. Ex. 19. The administrator of the PIP and the employee meet on

predetermined dates to discuss the employee's progress in terms of those goals. Ward Dep. Ex.

19. Employees who do not accomplish the goals listed in their PIP by the PIP's scheduled end-

date are commonly terminated. Ward Dep. Ex. 19.

Human Resources Business Partner Mary O'Leary helped Shea write the PIP for Ward.

Deposition of Mary O'Leary ("O'Leary Dep.") at 9. The PIP set forth several Performance

Improvement Needs, stressing the need to improve, among other things, Ward's leadership and

communication of information to employees in an accurate and timely manner. Ward Dep. Ex.

19. Although Ward challenges most of the criticism contained in the PIP, he does admit to some

shortcomings contained therein: (1) that he did not always complete his administrative tasks as

scheduled (Ward Dep. at 120); (2) that there were missing time sheets, and that it was his

responsibility to make sure that his technicians' time sheets were turned in and accurate (id. at 127-28); (3) that he was late for at least one scheduled meeting (id. at 129); (4) that he missed two school classes (id); and (5) that he was late to a Directors' meeting (id. at 130). Moreover, Ward's disagreement with other issues identified in the PIP is consistent with his disagreement with many other criticisms of his performance. Id. at 18-25 (testified that criticism by former supervisor was fabricated and/or racially motivated); 26-32 (testified that criticism by another former manager was fabricated).

On September 11, 2002, Shea met with Ward to discuss his progress under the PIP, informing him that there remained several areas in need of improvement. Ward Dep. Ex. 19. On November 26, 2002, Shea extended the PIP for two months, until February 3, 2003, writing, "Continuous, sustainable improvement must be realized from Dan in order to fulfill the requirements of this plan. Failure to meet this obligation could result in termination of employment." Id.

On November 26, 2002, Shea instructed Ward to meet with him in Braintree, that day, to have a discussion regarding Ward's performance under the PIP in the presence of Reed. Shea Dep. at 40, 43-45. Ward did not arrive for the meeting. Ward Dep. Ex. 20. As such, Shea suspended him for a day for insubordination, informing him of his suspension orally and in a letter. Ward Dep. Ex. 20.

Ultimately, Ward did meet with Shea and Reed on December 2, 2002 to discuss his progress under the PIP. Ward Dep. Ex. 19. At that time, Ward was informed both that he was not progressing in a satisfactory manner in that he had failed to undertake several actions called for by the PIP. Id. Ward's performance, however, never sufficiently improved. See, e.g., Ward Dep. Exs. 32 and 37.

## V.    Ward's Leave and Termination.

Verizon's compliance with the FMLA has been subcontracted. Deft's Ans. to Ints., Ans. No. 15(a) at p. 20. The subcontractor staffs the Absence Reporting Center ("ARC"). Any Verizon employee who anticipates absence from work or is absent from work is obliged by Verizon policies to contact the ARC and report. O'Leary Dep. at 16; Reed Dep. at 24-25. The ARC automatically sends an electronic notification of the absence to a designated e-mail address (typically the work group's supervisor). Shea Dep. at 92-93. The ARC will also maintain a record and automatically send an application for FMLA leave to the caller, and if the caller returns the application, the ARC processes it and makes an initial determination to grant or deny FMLA-covered leave. Shea Dep. at 91-92. If the ARC denies FMLA-covered leave, with its denial letter it informs the caller of his or her right to administrative review of the denial, which may result in a reversal. Mar. 20, 2003 Ltr. from ARC to Ward (VNE 01518).

On February 20, 2003, Ward called the ARC, reporting that he would be out sick from work. Shea Dep. at 75. The electronic notification of this absence was sent to the leader of Ward's group, Ward himself. Shea Dep. at 93-94. It is undisputed that the message did not get to Shea. Shea Dep. at 93. Although the facts concerning communications between Shea and Ward are in dispute, there is no dispute that Ward had an obligation, separate from the ARC, to keep Shea informed of his whereabouts. O'Leary Dep. at 16; Reed Dep. at 24-25; Ward Dep. at 160.

### A.    Shea's/Verizon's Recollection.

Shea testified that Ward told Shea that he had some broken pipes that required repair. Shea Dep. at 68. But not having heard from Ward for several days, he attempted to contact Ward on several occasions prior to his March 12, 2003 termination. Shea Dep. at 67.

Specifically, he attempted, without success, to contact him through Ward's primary pager, secondary pager, foreman-in-charge pager, cellular telephone, home telephone, by personally driving to Ward's home, leaving his business card affixed to Ward's home door, and sending Ward letters via U.S. Mail. Shea Dep. at 67-68. On the two occasions Shea actually reached Ward on his cellular telephone, Ward broke off the conversation. Id. at 65-66, 69-70. In addition, he contacted the Absence Reporting Center ("ARC") and learned that Ward had reported an absence on February 20 (and called again on March 2 or 3). Id. at 75.

Shea contacted O'Leary and told her that "he hadn't heard from [Ward] and didn't know where he was." O'Leary Dep. at 8. He also informed O'Leary that he had made numerous attempts to contract Ward. O'Leary Dep. at 14. O'Leary informed him that, generally, in such circumstances, Verizon will send a letter setting forth a date by which the employee must return to work or contact his supervisor. Shea Dep. at 80. O'Leary drafted such a letter (the "final warning letter") to Ward informing him that he would be terminated for job abandonment if he did not return to work. O'Leary Dep. at 6; Shea Dep. at 80; Ward Dep. Ex. 28.

O'Leary suggested that Shea leave the final warning letter at Ward's home. O'Leary Dep. 15, 17; Shea Dep. at 80. Thus, on March 7, 2003, Shea taped the final warning letter to Ward's home door instructing him to report to work at 173 Boston Street in Dorchester on March 10, 2003 at 7:00 AM, or, at the very least, to call Shea regarding his status by March 10. Ward Dep. at 162-63 and Ex. 28. The final warning letter informed Ward that if he failed to report for work as directed, Verizon would conclude that he had abandoned his job and may proceed to terminate his employment effective March 10, 2003. Ward Dep. Ex. 28.

According to Shea, Ward did not respond to the final warning letter. Shea Dep. at 81-82; O'Leary Dep. at 17. O'Leary informed Shea that, under such circumstances, Verizon normally

follows-up with a job termination letter, citing abandonment. O'Leary Dep. at 17, 21. She drafted a job termination letter and forwarded it to Juliette Patterson in the employee relations department, who reviewed it before it was sent to Ward. O'Leary Dep. at 19-20, 22.

Reed signed the termination letter after (1) conferring with O'Leary, who informed him that it was appropriate to go forward and (2) a discussion with Shea in which he confirmed that he had done "everything possible" to contact Ward. Reed Dep. at 26-28. Based on Ward's alleged failure to contact Shea, Reed approved Ward's termination. Id. at 31. Verizon sent the termination letter to Ward on March 12, 2003, informing him that he had been terminated due to abandonment of his job responsibilities. Ward Dep. Ex. 29.

Ward never spoke to anyone at Verizon regarding his termination. Ward Dep. at 169-71. His next communication was the filing of a MCAD charge.

### B.    Ward's Recollection.

Ward claims that he called Shea the first day of his absence and left him a voicemail informing him that he "was ill and that [he] wasn't going to make it to work" because he "had a bad migraine headache." Ward Dep. at 157, 159. Ward testifies that he spoke with Shea the next week and informed him that he was waiting to see a doctor. Id. at 159-60. He claims that he had at least four more conversations with Shea thereafter. Id. at 160. Although he concedes that Shea came to his house, he claims that Shea made such visits to "harass" him. Id. at 162. He admits that he received a copy of the final warning letter. Id. at 162-63. Contrary to Shea's testimony, however, Ward claims that, in response to the letter, he left a voicemail message for Shea informing him that he would not be returning to work yet due to his "condition" and the fact that he was under "doctor's care." Id. at 163-64. Although he concedes that the March 12, 2003 termination letter was sent to the same address as the warning letter was left, he denies

having received it. Id. at 164-65.

Ward offers no explanation why, if he interpreted Shea's multiple efforts to contact him as "harassment," he never made any efforts to contact anyone else in response to the final warning letter.

## VI.    **Ward's FMLA Request.**

On March 11, 2003, the ARC sent to Ward, via fax, a FMLA Medical Certification Form. Mar. 11, 2003 Ltr. from ARC to Ward (VNE 00531-32) The cover letter informed Mr. Ward that, should he wish to apply for FMLA leave, the form must be returned by March 17, 2003 (25 days from the day of his February 20, 2003 absence).

Ward signed the FMLA certification form on March 12, 2003, which contained information provided by his treating physician, David H. Cahan, M.D.  FMLA Certification Form (VNE 01520-27).  Ward submitted the form to the ARC. Id. Dr. Cahan, however, failed to set forth the date upon which Ward would be expected to return to work.  Mar. 20, 2003 Ltr. from ARC to Ward.  As such, Verizon denied his request. Id. On April 1, 2003, Dr. Cahan amended the form, setting forth that Ward's incapacity would continue until May 9, 2003. FMLA Certification Form (VNE 01520-27).  Ward provided this information to the ARC on or about April 2, 2003, and requested an administrative review of the denial of his request. Apr. 2, 2003 Ltr. from Ward to ARC (VNE 01519).  Verizon received Mr. Ward's request for administrative review of his FMLA denial on April 2, 2003.  Apr. 9, 2003 Ltr. from ARC to Ward (VNE 01517).  Verizon (through its Absence Reporting Center) responded via letter on May 9, 2003. Id.  In the letter, Verizon informed Plaintiff that, after a full review, it had determined that his request for FMLA leave should be granted (and therefore, not subject to Verizon's Absence Control Plan). Id.

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WARD'S RACE DISCRIMINATION CLAIM

Ward alleged that his termination amounted to race discrimination in violation of G.L. c. 151B. Where, as here, there is no direct evidence of discrimination, the court follows a three-stage order of proof. First, Ward has the burden of establishing a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he performed his job at an acceptable level; and (3) he was terminated. Abramian v. President & Fellows of Harvard College, 731 N.E.2d 1075, 1084 (Mass. 2000). If Ward establishes a prima facie case, Verizon and Shea must answer it by advancing lawful grounds for the action taken and producing evidence of underlying facts in support thereof. Id.; Blare v. Husky Injection Moldings Sys. Boston, Inc., 646 N.E.2d 111, 115 (Mass. 1995). The burden then shifts back to Ward to show that "discriminatory animus was the determinative cause of the adverse employment decision." Lipchitz v. Raytheon Co., 751 N.E.2d 360, 370-72 (Mass. 2001). Here, Ward's claim fails because he cannot establish a prima facie case of discrimination or that Defendants' proffered reason for his termination is a pretext.

### A.   Ward Cannot Establish a Prima Facie Case of Discrimination Due to His Poor Performance.

Ward cannot meet the "acceptable performance" element of the prima facie case of race discrimination. See, e.g., Abramian, 731 N.E.2d at 1084. He performed at an unacceptable level throughout his tenure at Verizon, and particularly in the final two years while he served as Manager of the Special Service Group. The employees supervised by Ward took more time to complete projects, on average, than the employees supervised by other managers, and more frequently were required to return to job sites to complete jobs they did not complete on their

first visit. Ward failed to submit required paperwork in a timely fashion, and failed to fill that paperwork out correctly. Ward was placed on a Performance Improvement Plan, but failed to meet the Plan's requirements. He was on the verge of being terminated for performance reasons when he left.

Ward was a marginal employee as a technician, and never became an acceptable manager. And not only was he marginal, but he was unwilling to acknowledge fault as to permit correction. Because Ward did not perform at an acceptable level, his race discrimination claim fails as a matter of law.

### B.    Ward Cannot Demonstrate Pretext.

Verizon and Shea claim that they discharged Ward because he failed to report to Shea regarding his status. Ward concedes that he had an obligation to do so. This explanation satisfies Defendants' burden of providing a non-discriminatory reason for its conduct. "Where, as here, the employer proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason . . . was a coverup for a discriminatory decision." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001) (internal quotations omitted). In assessing pretext, the court must look at the total package of proof offered by Ward. See Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). Ward has not provided sufficient evidence for a jury to disbelieve the stated reasons for termination, let alone that those reasons masked racial discrimination.

First, Ward has not shown that any other similarly situated employee (one who had failed to sufficiently report his absentee status to his supervisor) was treated differently. Cf. Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (holding that the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such

differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them for it). Nor has he established that Verizon failed to terminate other employees for what it deemed to be job abandonment.

Second, Ward could not recall any racial epithets or other objective indicia of a connection between his race and his treatment in general, or between his race and his termination. Although Shea allegedly told him that he "sucks" on one occasion, a single profanity, especially one with no racial content, is insufficient to show discriminatory animus. See Fontaine v. Ebtec Corp., 613 N.E.2d 881, 885 n. 7 (Mass. 1993); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) ("Although statements directly related to the challenged action may be highly probative in the pretext inquiry, mere generalized "stray remarks," arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance") (citations omitted). At best, Ward has produced evidence that Shea treated him in a harsh manner. However, "[c]hurlish and insensitive behavior by a supervisor, however regrettable, and however harmful to an employee, is not conduct falling within the prohibitions of the anti-discrimination laws." D'Amico v. Compass Group USA, Inc., 198 F. Supp. 2d 18, 24 (D. Mass.), aff'd, No. 02-1800, 2002 WL 31750166 (1st Cir. Dec. 9, 2002). Shea was, if anything, extremely sensitive to racial issues. It was he -- not Ward -- who contacted Verizon's EEO Officer to raise his concern about the alleged "Danny Boy" comment aimed at Ward.

Third, the final decisionmaker -- Reed -- was the same person who promoted Ward despite his undistinguished record as a technician. "In this circuit, the fact that an individual is hired by the same person who makes the decision to fire her [or him] creates a strong inference that the adverse employment decision was not motivated by discriminatory animus." Nedder v.

Rivier College, 908 F. Supp. 66, 79 (D.N.H. 1995) (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993)).

In sum, there simply exists no evidence in the record upon which the court may conclude that Verizon's decision to terminate him was based on anything other than the good faith belief that he had abandoned his job. As such, summary judgment should be entered in favor of Verizon and Shea on Ward's claim of race discrimination.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WARD'S CLAIM OF RETALIATION UNDER CHAPTER 151B

Ward has alleged that his termination from employment constituted a retaliatory discharge in violation of Chapter 151B, § 4. Lacking any direct evidence of a retaliatory motive, Ward has the burden of establishing a prima facie case of retaliation, and, in the wake of Defendants' introduction of nonretaliatory reasons for the various actions taken, the burden of proving that the articulated nonretaliatory reasons were pretext. See McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 309 (1st Cir. 1998); Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991).

To make out a prima facie case of retaliation under Chapter 151B, Ward must show (1) that he engaged in some protected activity; (2) that he suffered some adverse action; and (3) that a causal connection exists between the protected activity and the adverse action. Mole v. University of Massachusetts, 814 N.E.2d 329, 338-39 (Mass. 2004). Here, Ward establishes the first two elements: (1) he made internal complaints regarding what he deemed to be race discrimination; and (2) Verizon terminated his employment. He cannot establish a prima facie case of retaliation, however, because he cannot show a causal tie between those two events.

Ward complained to McGovern regarding what he deemed to be potential race

discrimination by Shea in late May 2002. He was terminated from employment on March 12 2003, nine and one-half months later, for job abandonment. The time span between Ward's protected activity and his termination is too long to support his desired inference of causation.[3] Where adverse employment actions follow close on the heels of protected activity, a causal relationship may be inferred. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988). However, as the elapsed time between those two events becomes greater, the inference weakens and eventually collapses. Here, the nine and one-half month delay between Ward's complaint of race discrimination and his termination is too long to assume an causal relationship. See, e.g., Wascura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (finding a three-and-one-half month time lag between protected activity and alleged retaliation, standing alone, insufficient for a finding of causation); Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month period insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient).

Even if Ward could establish a prima facie case of retaliation, as with the race discrimination claim, he cannot establish that the legitimate, nondiscriminatory reason proffered by Defendants for his discharge is a pretext. As such, summary judgment should be entered in favor of Verizon and Shea on Ward's claim of retaliation under Chapter 151B.

## III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WARD'S FMLA RETALIATION CLAIM

Ward claims that Defendants violated the anti-discrimination provisions of the FMLA by

---

[3]    That an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation. "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." Mesnick, 950 F.2d at 828.

terminating him in retaliation for having taken protected medical leave. Complaint ¶¶ 13-14.

To establish a prima facie FMLA retaliation claim, a plaintiff must show that (1) he or she

availed herself of a protected right under the FMLA; (2) an employment decision adversely

affected him or her; and (3) a causal connection between the two actions exists. Chavez v.

Thomas & Betts Corp., ____ F.3d ____, No. 03-2265, 2005 WL 139155, at *11 (10th Cir. Jan. 24,

2005); Hodgens v. General Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998). Here, Ward

cannot establish a prima facie case of FMLA retaliation because he did not give proper notice of

his FMLA claim prior to his termination and because there is no basis in the record for a

connection between his FMLA approved leave and his termination.

### A.    Ward Did Not Comply with the Notice Provisions of the FMLA.

The FMLA requires that employees provide their employers with appropriate notice of

their intent to take leave. See 29 U.S.C. § 2612 (e)(2). Neither Ward's call to the ARC on

February 20, 2003 reporting his illness nor his alleged telephone calls to Shea complied with that

requirement. While the employee need not expressly assert rights under the FMLA, or even

mention the FMLA, adequate notice requires more than a mere profession of "sickness" or

"illness." See, e.g., Brock v. United Grinding Techs., Inc., 257 F. Supp. 2d 1089, 1100-01 (S.D.

Ohio 2003) ("[t]o interpret the FMLA in such a way that an employer must investigate an

employee's leave whenever it is informed that the employee is "ill" or "sick" would certainly

create a burden on the employer that Congress did not intend"). "Only when the employer is

properly put on notice that a particular absence may be FMLA-protected does the employer's

interest in preventing or disciplining absenteeism yield to the employee's interest in taking

protected leave." Lukacinsky v. Panasonic Serv. Co., No. Civ. A. 03-40141 FDS, 2004 WL

2915347, at *5 n.7 (D. Mass. Nov. 29, 2004).

Where an employee has not complied with the notice provisions of the FMLA, his or her employer may properly rebuke that employee for excessive absenteeism *even if the employer finds out afterwards that FMLA protection had attached retroactively to those absences.* See Lukacinsky at *10 n.13. An employer is not required to be clairvoyant with respect to whether a particular leave qualifies under the FMLA. Here, Ward did not provide sufficient notice of his health condition until he turned in his FMLA forms on March 12, 2004 -- the day of his termination. As such, he simply cannot make out a prima facie case of FMLA retaliation.

**B.    Verizon Properly Terminated Ward's Employment Based on His Failure to Inform Shea of His Status.**

If Ward were able to establish a prima facie claim, the burden would shift to Verizon and Shea to articulate a legitimate, non-discriminatory reason for his termination. See Chavez, 2005 WL 139155, at *11; Hodgens, 144 F.3d at 166-67; D'Amico v. Compass Group USA, Inc., 198 F.Supp.2d 18, 23-24 (D. Mass. 2002). Here, Verizon and Shea have indeed articulated a legitimate, non-discriminatory reason -- namely, that they terminated Plaintiff's employment based on his failure to report to Shea.

"The FMLA does not prohibit an employer from requiring its employees to give notice . . . on the day the employee is going to be absent . . . ." Holmes v. Boeing Co., 166 F.3d 1221 (unpublished opinion), 1999 WL 9760, at *3 (10th Cir. Jan. 12, 1999). Even if Ward properly requested FMLA leave, his request does not shelter him from the obligation to comply with Verizon's attendance policy. See, e.g., Chavez, 2005 WL 139155, at *11 (terminating employee for violating no-show policy is a legitimate, non-discriminatory reason); Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 710 (7th Cir. 2002) (employer may terminate an employee on FMLA leave for failing to comply with company's notice requirements). As such, for Ward's claim to succeed, he must prove that Verizon and Shea's preferred reason is, in fact, a pretext for

retaliation.

There is no evidence that Shea's or Reed's behavior was out of anger at Ward's exercising FMLA rights. First, Ward conceded at his deposition that Verizon requires its employees to contact their supervisors regarding absences. Second, Ward claims only that he contacted Shea on a few occasions during his leave (and never mentioned the FMLA or the specific details of his condition during any of them). Moreover, Shea's claim that he left a voicemail in response to the final warning letter -- instead of ensuring that he spoke with Shea directly -- is, at best, suspect. As such, summary judgment should be granted in favor of Verizon and Shea on Ward's claim of FMLA retaliation.[4]

## CONCLUSION

For the foregoing reasons, Verizon and Shea respectfully request that this Court grant their Motion for Summary Judgment.

VERIZON NEW ENGLAND INC.
and **MICHAEL B. SHEA**

By their attorneys,

Arthur G. Telegen (BBO # 494140)
David C. Kurtz (BBO # 641380)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: January 31, 2005

---

[4] Ward would ask a jury to believe that Shea's multiple efforts to contact him, including going to Ward's house, were an effort to harass him, but that nonetheless his only response to Shea's letter threatening discharge was to leave <u>Shea</u> (not Reed or McGovern or anyone else at Verizon) a voicemail in response; that Shea having spent months talking Ward through a PIP that was about to end in discharge would jeopardize his own interests and Verizon's by such an easily deflected strategy; and, finally, that he got the first letter, and not the second. Although Defendants question whether any reasonable jury could accept Ward's story, the Court need not reach this issue to award them summary judgment.

CERTIFICATE OF SERVICE
I hereby certify that on this day a true copy of the above document was served upon the Attorney of Record for each Party by mail-hand on 1/31/05