UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB -3  P 12: 25

U.S. DISTRICT COURT
DISTRICT OF MASS.

DANIEL P. WARD,

    Plaintiff,

v.

VERIZON CORPORATION and
MICHAEL B. SHEA,

    Defendants.

CIVIL ACTION NO. 03-12281-RCL

## DEFENDANTS' LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with Local Rule 56.1, Defendants Verizon New England Inc. ("Verizon") and Michael B. Shea ("Shea") hereby submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.[1]

### I.   Ward's Verizon History.

1.   Plaintiff Daniel P. Ward ("Ward"), an African-American male, was employed by Verizon for 20 1/2 years until his termination on March 12, 2003. Complaint, ¶ 5; Deposition of Daniel P. Ward ("Ward Dep.") Ex. 29.[2] Between 1991 and 2001, Verizon formally and informally disciplined Ward for a wide variety of performance deficiencies, including failure to complete tasks, excessive time on jobs, insufficient customer contact, rudeness towards

---

[1] On January 31, 2005, Defendants filed their summary judgment papers. In support of their Motion for Summary Judgment, Defendants submitted a Memorandum of Law which includes a Local Rule 56.1 compliant statement of undisputed material facts. To assist Plaintiff in responding to Defendants' statement of facts, and for ease of reference for the Court, Defendants hereby re-submit their Rule 56.1 statement as a separate document with numbered paragraphs. The statement of facts contained herein is identical to the one contained in Defendants' Memorandum of Law.

[2] All pleadings, transcripts and exhibits referred to herein are attached to the Affidavit of David C. Kurtz filed with Defendants' January 31, 2005 summary judgment papers.

FHBOSTON/2174880.1

customers, poor performance and poor quality. Ward Dep. Exs. 2-13. Verizon utilized several disciplinary methods to address those deficiencies, including suspensions, verbal warnings, written warnings, letters of discipline and contact memoranda. Id.

2. Several of Ward's formal reviews during that ten year period reflected his performance deficiencies. In January of 1997, Ward received a written appraisal of his performance as a Splice Service Technician ("SST") for the year 1996. He was rated "Below Requirements" ("BR") in one of four categories: "Quality," due to insufficient accuracy, thoroughness, accountability and attention to detail in his work assignments. Ward received an overall rating of BR for 1996. Defendant Verizon New England, Incorporated's Answers and Objections to Ward's First Set of Interrogatories ("Deft's Ans. to Ints."), Ans. No. 5, pp 5-6.

3. In February of 1998, Ward received a written appraisal of his performance as a Splice Service Technician ("SST") for the year 1997. He was rated "Below Target" ("BT") in one of four categories: "Quality," due to insufficient accuracy, thoroughness, accountability and attention to detail in his work assignments. Ward received an overall rating of "Needs Development" ("ND") for 1997. Id. at pp. 6-7.

4. On February 23, 2000, Ward received a written appraisal of his performance as manager for the year 1999, along with an oral review. He was rated "Improvement Needed to be Effective" ("IN") in two of 7 categories: "Communication", due to poor listening skills and an inability to convey directions clearly; and "Leadership and Development of Employees", due to poor leadership skills. Id. at p. 7.

5. On March 14, 2001, Ward received a written appraisal of his performance as manager for the year 2000, along with an oral review. He was rated IN (Improvement Needed) in two of twelve categories: "Meet or Exceed the incurred expense budget", due to high absence

rates among his technicians; and "Leadership and Development of Employees," due to his failure to create an atmosphere of inclusion. Id. at p. 7; Ward Dep. Ex. 14. His overall rating, however, was EM (Exceeds/Meets Position Requirements). Ward Dep. Ex. 14.

## II. Ward Becomes a Manager in the Special Service Group.

6. Despite his poor disciplinary record and mediocre reviews as an hourly technician, Verizon nonetheless provided Ward with advancement opportunities. In early 2001, Ken MacDonald, a manager in the Wholesale Operations group, recommended that Ward be promoted to a supervisory position. Deposition of John Reed ("Reed Dep.") at 7-8. John Reed, Director of Wholesale Operations, the same manager who ultimately discharged Ward in March 2003, approved MacDonald's recommendation and, in or about March 2001, named Ward a manager in the Special Service Group. Id.; Ward Dep. at 39.

7. The Special Service Group installed and maintained special service equipment, such as circuits and cards. Ward Dep. at 39. In addition, the employees in the Special Service Group installed and maintained radio circuits and installed and maintained CLEC (Competitive Local Exchange Carrier) services. Id. at 40-41.

8. In or about April 2001, approximately one month after Ward joined the Special Service Group, Michael Shea became his supervisor. Id. at 41, 49. Shea served as Area Manager for the Wholesale Department and was charged with overall responsibility for the Special Services Group. Id. at 50; Deposition of Michael Shea ("Shea Dep.") at 6. Ward worked for the remainder of his Verizon employment under Shea's supervision. Ward Dep. at 43.

9. Ward supervised approximately 15 Special Service Technicians as a manager in the Special Service Group. Ward Dep. at 44-45. His responsibilities included supervising the

technicians' activities and ensuring that they were abiding by Verizon standards in performing their duties. Ward Dep. at 47. His job was more difficult than his previous job, requiring him to supervise fifteen employees who traveled about performing services for customers, as opposed to nine employees who all worked at one location. Ward Dep. at 47-49.

10.   Sometime in mid-2001, when Shea was critical of Ward's work, Ward alleged that Shea's treatment of him was racially motivated. Ward Dep. at 115. Initially, he reached that conclusion because a mid-year review issued to him "had all these negative things in there, very opinionated stuff." Ward Dep. at 116. Ward had similarly concluded that a previous manager who had critiqued his performance was racially motivated. Id. at 25.

### III. The Kyller/Cogavin/Lyons Incident.

11.   In or about November 2001, Ward had a confrontation with two of the technicians in his group, James Kyller and James Cogavin. Ward Dep. at 68-70, 77. When Ward challenged them about their performance on a job, they allegedly said "some really lousy things" to him. Id. at 78. Although they may have used expletives, there was no racial content. Id. at 81. In addition, Mr. Kyller allegedly attempted to trip Ward with a wire. Id. at 78-79. Ward, however, did not seek to discipline them. Id. at 84. That same day, Union Steward Steve Lyons allegedly screamed at Ward regarding the confrontation between Ward and Kyller/Cogavin. Id. at 86-87. Lyons allegedly referred to Daniel Ward as "Danny Boy" during his tirade. Id. at 94. Ward believed, however, that none of Lyons' words toward him were racially-related. Id. at 88-89.

12.   Nevertheless, Shea, Ward's manager, was concerned about the possible racial implications of Lyons' behavior. Shea contacted Verizon EEO Officer Paul McGovern regarding Ward's discussion with Lyons, because Shea believed that Lyons' alleged use of the term "Danny Boy" was inappropriate and, perhaps discriminatory. Shea Dep. at 23-25.

McGovern initiated an investigation, and, ultimately found no discriminatory conduct by Lyons. Id. at 25-26.

### IV. Ward's Relationship With Shea.

13. On March 13, 2002, Ward received a written appraisal from Shea of his performance as manager for the year 2001, along with an oral review. He was rated Improvement Needed ("IN") in three of four categories: "Customer Focus," due to his failure to deliver quality products and services; "Leadership Focus," due to poor leadership skills; and "Results Focus," due to his failure to improve as a manager. Ward received an overall appraisal of IN for 2001. Ward Dep. Exs. 16, 18. Ward disagreed with the poor review. Ward Dep. at 117-18 and Ex. 16. In the comment section of the review, he wrote: "I'm not sure if I agree with this." Ward Dep. Ex. 16. He did not, however, file any immediate complaint.

14. On May 23, 2002, Ward and Shea allegedly met in Shea's office to discuss a proposed Reduction-in-Force in their department. Ward Dep. Ex. 21. Allegedly, Shea informed Ward at the meeting that he was Shea's "poorest performer last year" and concluded by saying, "You suck; you're lucky to have a job." Ward Dep. at 111 and Ex. 21. That day, Ward called Verizon EEO Officer McGovern to complain about Shea. Ward Dep. Ex. 21.

15. Thereafter, on May 29, 2002, Ward sent McGovern a follow-up letter claiming that Shea not only treated him more harshly than his peers, but undeservedly so because Ward was in fact outperforming his peers. Ward Dep. Ex. 21. With respect to his discrimination claim, Ward wrote, "as a person of color, I feel that I have been singled out and treated different from other managers in my department. Somehow, I am being held to a higher standard than they are." Id.

16. McGovern investigated Ward's claim of discrimination. Shea Dep. at 27. As part of his investigation, he interviewed Shea, and requested documentation on any less than satisfactory management appraisals on any other employees managed by Shea, sought information regarding other minorities on Shea's team, and asked for names of people who could substantiate or refute Ward's claims. Id. at 27. After a full investigation, McGovern contacted Ward to inform him that he had concluded his investigation, and that he had identified no evidence of discrimination in Shea's reviews or treatment of Ward. Deft's Ans. to Ints., Ans. No. 9, p. 14.

17. Although Ward accuses Shea of discrimination, he admits that Shea never said anything to him containing a racial epithet or stereotype. Ward Dep. at 116-17. In fact, the only incident between Shea and Ward that relates to race is Shea's response to the Lyons incident. Nonetheless, he believes that Shea had a racist attitude toward him because of "the way he talked down to [him], the way he treated [him] altogether from the beginning, the way he treated others." Ward Dep. at 117. For instance, he testified that Shea (1) favored other, unspecified managers (id. at 100); (2) referred to him as "Daniel" instead of "Dan", which he prefers (id.); (3) shut him out from overtime and flex time opportunities, although he never sought them (id. at 100-04); (4) "talked down" to him (id. at 105-06); and (5) screamed at him and threatened to suspend him or send him home (id. at 106-07).

## V. The Performance Improvement Plan.

18. On July 18, 2002, Verizon placed Ward on a Personal Improvement Plan ("PIP"). Ward Dep. at 114-15 and Ex. 19. Through a PIP, Verizon informs underperforming employees of the deficiencies in their work, and provides them with specific goals for improving those deficiencies. Ward Dep. Ex. 19. The administrator of the PIP and the employee meet on

predetermined dates to discuss the employee's progress in terms of those goals. Ward Dep. Ex. 19. Employees who do not accomplish the goals listed in their PIP by the PIP's scheduled end-date are commonly terminated. Ward Dep. Ex. 19.

19. Human Resources Business Partner Mary O'Leary helped Shea write the PIP for Ward. Deposition of Mary O'Leary ("O'Leary Dep.") at 9. The PIP set forth several Performance Improvement Needs, stressing the need to improve, among other things, Ward's leadership and communication of information to employees in an accurate and timely manner. Ward Dep. Ex. 19. Although Ward challenges most of the criticism contained in the PIP, he does admit to some shortcomings contained therein: (1) that he did not always complete his administrative tasks as scheduled (Ward Dep. at 120); (2) that there were missing time sheets, and that it was his responsibility to make sure that his technicians' time sheets were turned in and accurate (id. at 127-28); (3) that he was late for at least one scheduled meeting (id. at 129); (4) that he missed two school classes (id); and (5) that he was late to a Directors' meeting (id. at 130). Moreover, Ward's disagreement with other issues identified in the PIP is consistent with his disagreement with many other criticisms of his performance. Id. at 18-25 (testified that criticism by former supervisor was fabricated and/or racially motivated); 26-32 (testified that criticism by another former manager was fabricated).

20. On September 11, 2002, Shea met with Ward to discuss his progress under the PIP, informing him that there remained several areas in need of improvement. Ward Dep. Ex. 19. On November 26, 2002, Shea extended the PIP for two months, until February 3, 2003, writing, "Continuous, sustainable improvement must be realized from Dan in order to fulfill the requirements of this plan. Failure to meet this obligation could result in termination of employment." Id.

21. On November 26, 2002, Shea instructed Ward to meet with him in Braintree, that day, to have a discussion regarding Ward's performance under the PIP in the presence of Reed. Shea Dep. at 40, 43-45. Ward did not arrive for the meeting. Ward Dep. Ex. 20. As such, Shea suspended him for a day for insubordination, informing him of his suspension orally and in a letter. Ward Dep. Ex. 20.

22. Ultimately, Ward did meet with Shea and Reed on December 2, 2002 to discuss his progress under the PIP. Ward Dep. Ex. 19. At that time, Ward was informed both that he was not progressing in a satisfactory manner in that he had failed to undertake several actions called for by the PIP. Id. Ward's performance, however, never sufficiently improved. See, e.g., Ward Dep. Exs. 32 and 37.

## V.  Ward's Leave and Termination.

23. Verizon's compliance with the FMLA has been subcontracted. Deft's Ans. to Ints., Ans. No. 15(a) at p. 20. The subcontractor staffs the Absence Reporting Center ("ARC"). Any Verizon employee who anticipates absence from work or is absent from work is obliged by Verizon policies to contact the ARC and report. O'Leary Dep. at 16; Reed Dep. at 24-25. The ARC automatically sends an electronic notification of the absence to a designated e-mail address (typically the work group's supervisor). Shea Dep. at 92-93. The ARC will also maintain a record and automatically send an application for FMLA leave to the caller, and if the caller returns the application, the ARC processes it and makes an initial determination to grant or deny FMLA-covered leave. Shea Dep. at 91-92. If the ARC denies FMLA-covered leave, with its denial letter it informs the caller of his or her right to administrative review of the denial, which may result in a reversal. Mar. 20, 2003 Ltr. from ARC to Ward (VNE 01518).

24. On February 20, 2003, Ward called the ARC, reporting that he would be out sick

from work. Shea Dep. at 75. The electronic notification of this absence was sent to the leader of Ward's group, Ward himself. Shea Dep. at 93-94. It is undisputed that the message did not get to Shea. Shea Dep. at 93. Although the facts concerning communications between Shea and Ward are in dispute, there is no dispute that Ward had an obligation, separate from the ARC, to keep Shea informed of his whereabouts. O'Leary Dep. at 16; Reed Dep. at 24-25; Ward Dep. at 160.

### A.     Shea's/Verizon's Recollection.

25.     Shea testified that Ward told Shea that he had some broken pipes that required repair. Shea Dep. at 68. But not having heard from Ward for several days, he attempted to contact Ward on several occasions prior to his March 12, 2003 termination. Shea Dep. at 67. Specifically, he attempted, without success, to contact him through Ward's primary pager, secondary pager, foreman-in-charge pager, cellular telephone, home telephone, by personally driving to Ward's home, leaving his business card affixed to Ward's home door, and sending Ward letters via U.S. Mail. Shea Dep. at 67-68. On the two occasions Shea actually reached Ward on his cellular telephone, Ward broke off the conversation. Id. at 65-66, 69-70. In addition, he contacted the Absence Reporting Center ("ARC") and learned that Ward had reported an absence on February 20 (and called again on March 2 or 3). Id. at 75.

26.     Shea contacted O'Leary and told her that "he hadn't heard from [Ward] and didn't know where he was." O'Leary Dep. at 8. He also informed O'Leary that he had made numerous attempts to contract Ward. O'Leary Dep. at 14. O'Leary informed him that, generally, in such circumstances, Verizon will send a letter setting forth a date by which the employee must return to work or contact his supervisor. Shea Dep. at 80. O'Leary drafted such a letter (the "final warning letter") to Ward informing him that he would be terminated for job

abandonment if he did not return to work. O'Leary Dep. at 6; Shea Dep. at 80; Ward Dep. Ex. 28.

27. O'Leary suggested that Shea leave the final warning letter at Ward's home. O'Leary Dep. 15, 17; Shea Dep. at 80. Thus, on March 7, 2003, Shea taped the final warning letter to Ward's home door instructing him to report to work at 173 Boston Street in Dorchester on March 10, 2003 at 7:00 AM, or, at the very least, to call Shea regarding his status by March 10. Ward Dep. at 162-63 and Ex. 28. The final warning letter informed Ward that if he failed to report for work as directed, Verizon would conclude that he had abandoned his job and may proceed to terminate his employment effective March 10, 2003. Ward Dep. Ex. 28.

28. According to Shea, Ward did not respond to the final warning letter. Shea Dep. at 81-82; O'Leary Dep. at 17. O'Leary informed Shea that, under such circumstances, Verizon normally follows-up with a job termination letter, citing abandonment. O'Leary Dep. at 17, 21. She drafted a job termination letter and forwarded it to Juliette Patterson in the employee relations department, who reviewed it before it was sent to Ward. O'Leary Dep. at 19-20, 22.

29. Reed signed the termination letter after (1) conferring with O'Leary, who informed him that it was appropriate to go forward and (2) a discussion with Shea in which he confirmed that he had done "everything possible" to contact Ward. Reed Dep. at 26-28. Based on Ward's alleged failure to contact Shea, Reed approved Ward's termination. Id. at 31. Verizon sent the termination letter to Ward on March 12, 2003, informing him that he had been terminated due to abandonment of his job responsibilities. Ward Dep. Ex. 29.

30. Ward never spoke to anyone at Verizon regarding his termination. Ward Dep. at 169-71. His next communication was the filing of a MCAD charge.

### B. Ward's Recollection.

31. Ward claims that he called Shea the first day of his absence and left him a voicemail informing him that he "was ill and that [he] wasn't going to make it to work" because he "had a bad migraine headache." Ward Dep. at 157, 159. Ward testifies that he spoke with Shea the next week and informed him that he was waiting to see a doctor. Id. at 159-60. He claims that he had at least four more conversations with Shea thereafter. Id. at 160. Although he concedes that Shea came to his house, he claims that Shea made such visits to "harass" him. Id. at 162. He admits that he received a copy of the final warning letter. Id. at 162-63. Contrary to Shea's testimony, however, Ward claims that, in response to the letter, he left a voicemail message for Shea informing him that he would not be returning to work yet due to his "condition" and the fact that he was under "doctor's care." Id. at 163-64. Although he concedes that the March 12, 2003 termination letter was sent to the same address as the warning letter was left, he denies having received it. Id. at 164-65.

32. Ward offers no explanation why, if he interpreted Shea's multiple efforts to contact him as "harassment," he never made any efforts to contact anyone else in response to the final warning letter.

### VI. Ward's FMLA Request.

33. On March 11, 2003, the ARC sent to Ward, via fax, a FMLA Medical Certification Form. Mar. 11, 2003 Ltr. from ARC to Ward (VNE 00531-32) The cover letter informed Mr. Ward that, should he wish to apply for FMLA leave, the form must be returned by March 17, 2003 (25 days from the day of his February 20, 2003 absence).

34. Ward signed the FMLA certification form on March 12, 2003, which contained information provided by his treating physician, David H. Cahan, M.D. FMLA Certification

Form (VNE 01520-27). Ward submitted the form to the ARC. Id. Dr. Cahan, however, failed to set forth the date upon which Ward would be expected to return to work. Mar. 20, 2003 Ltr. from ARC to Ward. As such, Verizon denied his request. Id. On April 1, 2003, Dr. Cahan amended the form, setting forth that Ward's incapacity would continue until May 9, 2003. FMLA Certification Form (VNE 01520-27). Ward provided this information to the ARC on or about April 2, 2003, and requested an administrative review of the denial of his request. Apr. 2, 2003 Ltr. from Ward to ARC (VNE 01519). Verizon received Mr. Ward's request for administrative review of his FMLA denial on April 2, 2003. Apr. 9, 2003 Ltr. from ARC to Ward (VNE 01517). Verizon (through its Absence Reporting Center) responded via letter on May 9, 2003. Id. In the letter, Verizon informed Plaintiff that, after a full review, it had determined that his request for FMLA leave should be granted (and therefore, not subject to Verizon's Absence Control Plan). Id.

Respectfully submitted,

**VERIZON NEW ENGLAND INC.** and
**MICHAEL B. SHEA**

By their attorneys,

_____
Arthur G. Telegen (BBO # 494140)
David C. Kurtz (BBO # 641380)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: February 2, 2005

- 13 -

## CERTIFICATE OF SERVICE

On February 2, 2005, I, David C. Kurtz, hereby caused a copy of Defendants' Local Rule 56.1 Statement of Undisputed Material Facts to be served via first class mail upon Paul Manoff, Esq., counsel of record for Plaintiff Daniel P. Ward.

_____
David C. Kurtz