UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DANIEL P. WARD,

    Plaintiff

v.     C.A. NO. 03-12281-RCL

VERIZON CORPORATION and
MICHAEL B. SHEA,

    Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED
IN CLERKS OFFICE
2005 FEB 22 P 3: 10
U.S. DISTRICT COURT
DISTRICT OF MASS

## AFFIDAVIT OF DANIEL P. WARD

I, Daniel P. Ward, hereby depose and say as follows:

1. I am the plaintiff in the above matter.

2. In 1999 I was promoted to the position of local manager, first level, notwithstanding these alleged performance deficiencies. I was told at the time of my promotion by the hiring manager, George Lees, that my prior disciplinary record was not a factor in the consideration of my promotion, because the discipline was long ago, my accomplishments were significant and he was aware that some of discipline was the result of a personality conflict. Dennis Law, my former manager, responsible for much of the discipline, was fired around the time of my promotion.

3. My overall ratings on both occasions were EM, Exceeds/Meets objective. I was given raises and a bonus on the occasion of each review.

4. Mr. Shea at the time had not had an adequate chance to assess my performance. I had been out several months due to an ankle operation. He gave me the mid-year review right after I returned from work, not waiting until he supervised me for 6 months.

5. Mr. McGovern told me that he agreed with me that Mr. Shea's criticisms of me were unfounded and not fair, but he said he could not find conclusive evidence that Shea's treatment of me was racially motivated.

6. Approximately 3:15 on that date, I was called by Patti Comoletti, Shea's secretary, who told me that Mr. Shea wanted to meet with me. She did not identify the location where I was supposed to go to or tell me that he wanted to see me immediately. I assumed he wanted to see me at the office in Dorchester. I told her I would finish the job I was on and go see him. Shea later called me about 4:00 p.m., as I was about to get on the subway, and told me to come immediately. He didn't say he was in Braintree. I went to the Dorchester office and he was not there.

7. On the first day I was out sick with my severe migranes (February 20), I spoke to Mr. Shea and told him I was having severe headaches, I had contacted the ARC, and that I was going to see my doctor. He told me to keep him apprised of my medical situation and I said I would. Subsequent to that conversation, I spoke to him 3-4 more times and told him I was under my doctor's care, and did not know when I would be back to work. Other times he called me and I returned his calls and left him voicemail messages as to my situation. I was not living at 55 Weybosset Street at the time and I had informed Shea that I was staying somewhere else. I never broke off conversations when he called me on my cell phone. At all times I made a continuous effort to inform Mr. Shea of my medical situation.

8. I did not receive the letter (because I wasn't staying at Weybosset Street) until Sunday, the day before I was supposed to call. I called Mr. Shea that Monday morning and left a detailed message on his voicemail, telling him, I was still out sick and under the doctor's care and was still going for tests. Mr. Shea never returned the call.

Signed under the pains and penalties of perjury this 16th day of February, 2005.

_____
Daniel P. Ward

ward\affward