**Page 1**

Pages: 1-97
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A.#: 1228-RCL

* * * * * * * * * * * * *

DANIEL WARD,

    Plaintiff

VS.

VERIZON CORPORATION and MICHAEL B. SHEA,

    Defendants

* * * * * * * * * * * * *

DEPOSITION OF MICHAEL B. SHEA, a witness called by and on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Joan Applegate, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Paul Manoff, Esq. 47 Winter Street, Boston, Massachusetts, on Tuesday, October 26, 2004 commencing at 10:55 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**Page 2**

APPEARANCES:

Paul Manoff, Esq.
47 Winter Street
Boston MA 02108
On behalf of the Plaintiff;

Arthur G. Telegen, Esq.
Matthew L Adams, Esq.
Foley, Hoag, LLP
155 Seaport Boulevard
Boston MA 02210-2600
On behalf of the Defendants.

ALSO PRESENT:
Daniel Ward, Plaintiff

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**Page 3**

I N D E X

DEPONENT
Michael B. Shea

EXAMINATION      PAGE
(By Mr. Manoff)      4

E X H I B I T S
NO.    DESCRIPTION      PAGE
None

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**Page 4**

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that the sealing, filing, and certification of the deposition are waived.

It is further stipulated and agreed by counsel that all objections, except as to the form of the question, are reserved until the time of trial. Motions to strike are reserved until the time of trial or other evidentiary use of the transcript.

The witness exercises his right to read the transcript and sign the original signature page under the pains and penalties of perjury. If the transcript is not signed within 30 days of receipt thereof, it is deemed accurate.

MICHAEL B. SHEA, having duly affirmed that his testimony would be the truth, the whole truth, and nothing but the truth, testified as follows in answer to direct interrogatories:

BY MR. MANOFF:

Q.  Would you state your full name?

SHEA COURT REPORTING SERVICES
(617) 227-3097

DEPOSITION OF MICHAEL B. SHEA

**9**

1  Q.  Technicians reported directly to you or they
2      reported to the local managers?
3  A.  They reported to the local managers.
4  Q.  So you had approximately 12 local managers
5      that reported to you?
6  A.  Yes.
7  Q.  That included Mr. Ward?
8  A.  Yes, it did.
9  Q.  They all worked out of the same address in
10     Dorchester?
11 A.  No, they were in various locations.
12 Q.  Where was Mr. Ward located?
13 A.  At 173 Boston Street in Dorchester.
14 Q.  How many of those 12 area managers that
15     reported to you were located out of
16     173 Boston Street in Dorchester?
17 A.  At one point in time, six.
18 Q.  Where did Mr. Ward spend the majority of his
19     time?
20 A.  I don't know if I can answer that question.
21 Q.  Was his job one mostly in the office or
22     mostly out in the field, or was it 50-50?
23 A.  It wasn't a 50-50.  It was more -- the
24     intent was to have done in the field

SHEA COURT REPORTING SERVICES
(617) 227-3097

**10**

1      maybe at 60 percent of the day and spend
2      40 percent of his time in the office.
3  Q.  How far away was his office from yours?
4  A.  A corridor's length.
5  Q.  How long did you have that area manager's
6      position?
7  A.  From May of 2001 through the end of -- well,
8      until the end of 2003 towards the November
9      time frame of 2003.
10 Q.  What was your position before April or May
11     of 2001?
12 A.  I was a temporary regional operations staff
13     senior specialist working on projects to
14     consolidate work centers.
15 Q.  I take it in that position you had no
16     contact with Mr. Ward?
17 A.  That's correct.
18 Q.  Did Mr. Ward work under your predecessor as
19     area manager at the time during the years
20     2000 and the first part of 2001?
21 A.  I'm not sure.
22 Q.  Who was your predecessor in the position of
23     area manager?
24 A.  Michael Kovalski.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**11**

1  Q.  I take it, then, that you had no role in
2      promoting Mr. Ward to manager?
3  A.  No, I had no role.
4  Q.  You just inherited him in April or May of
5      2001 when you changed positions?
6  A.  That's right.
7  Q.  Did you meet Mr. Ward prior to April or May
8      of 2001?
9  A.  No.
10 Q.  Do you know who promoted Mr. Ward to the
11     manager job?
12 A.  Yes.
13 Q.  Who was that?
14 A.  Kenneth MacDonald.
15 Q.  Who was he?
16 A.  Kenneth was a wholesale area manager.
17 Q.  He was prior to your predecessor?
18 A.  He actually was a peer to my predecessor.
19 Q.  Did you ever discuss with Mr. MacDonald the
20     reasons that Mr. Ward was promoted?
21 A.  No.
22 Q.  Did you ever form an opinion as to whether
23     or not Mr. Ward should have been promoted to
24     the manager position?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**12**

1  A.  Yes.
2  Q.  What was your opinion?
3  A.  My opinion was that he probably was not
4      ready for a manager's position.
5  Q.  What made you think that?
6  A.  Based on the observed skills that he
7      demonstrated over the course of our
8      interaction.
9  Q.  Did you feel like he was promoted to the
10     manager's position because of affirmative
11     action requirements?
12 A.  No.
13 Q.  You didn't think his race has anything to do
14     with his promotion?
15 A.  I am sure it was part of the consideration,
16     but that wasn't --
17 Q.  Why do you think it was part of the
18     consideration?
19 A.  I only say that because I know that we have
20     an obligation to maintain certain EEO
21     opportunities, and as a corporate direction
22     we actively seek to promote diverse
23     candidates into the ranks of management.
24 Q.  Any other minority persons who were managers

SHEA COURT REPORTING SERVICES
(617) 227-3097

**13**

1  reporting directly to you at 173 Boston
2  Street in Dorchester?
3  A.  Not persons of color, but I did have females
4  working for me at 173 Boston Street.
5  Q.  White females?
6  A.  White females.
7  Q.  Did you ever tell Mr. Ward that he was lucky
8  to have the job?
9  A.  No specific recollection of that discussion,
10  no.
11  Q.  Did you think he was lucky to have the job?
12  A.  Yes.
13  Q.  What made you think he was lucky to have the
14  job?
15  A.  It's my feeling or perception that all of us
16  employed by Verizon are fortunate to be
17  employed by Verizon and lucky to have the
18  job.
19  Q.  Did you think Mr. Ward was more lucky to
20  have the job?
21  A.  No.
22  Q.  What made you think he wasn't qualified for
23  the job?
24  A.  Observed behavior, management skills, poor

SHEA COURT REPORTING SERVICES
(617) 227-3097

**14**

1  communication with his technicians, poor
2  leadership skills displayed.
3  Q.  Can you give me any specific examples?
4  A.  There were several interactions that I have
5  witnessed between him and his technicians
6  during morning group meetings that I thought
7  could have been handled better from a
8  communications aspect.  I felt that his
9  technicians often were lacking information
10  that they sought from Dan and Dan was not
11  able to provide to them.
12  Q.  Something you witnessed or you heard about?
13  A.  Both.
14  Q.  Tell me what interactions with his
15  technicians you witnessed that you
16  thought -- that led you to believe that he
17  had lacked in communication skills.
18  A.  There were several occasions where I sat in
19  meetings with Dan as he disseminated
20  information to his technician team.  The
21  team would often ask questions -- I don't
22  remember the specifics of the question --
23  but I often noticed that his technicians
24  were left with open-ended issues and

SHEA COURT REPORTING SERVICES
(617) 227-3097

**15**

1  questions that couldn't be answered by Dan
2  that should have been answered by Dan.
3  Q.  But you can't recall any of the specific
4  questions?
5  A.  I can't recall the specifics.
6  Q.  Anything else that you believe Mr. Ward
7  lacked the skills to be the manager?
8  A.  His follow-up capabilities were lacking.
9  Again, his technicians would come asking or
10  requesting for things such as tools, time
11  sheets, preparations, general information on
12  services that we provisioned, and again, the
13  support wasn't there from Dan.  He wasn't
14  able to answer those questions with his
15  technicians or address the concerns and
16  issues that the techs had.
17       I saw his peer-to-peer relation-
18  ships were not strong.  He seemed unable to
19  strengthen some of these key relationships
20  with his immediate peer group and those in
21  support positions surrounding us in the
22  wholesale group.
23  Q.  Can you give me any specific examples?
24  A.  Dan was obliged to provide our resource

SHEA COURT REPORTING SERVICES
(617) 227-3097

**16**

1  manager information on a regular basis; that
2  information was often not delivered, and
3  when it was delivered it was incomplete or
4  inadequate.
5       He was also obligated to provide
6  analysis on who caused service failures
7  associated with his direct team, and the
8  analysis that he provided to a quality
9  analyst at the time was often incomplete
10  and/or missing or tardy or didn't address
11  the underlying issue of what we were trying
12  to address.
13       Dan -- part of his responsibility
14  is to maintain a schedule of where he is
15  supposed to be, and oftentimes that schedule
16  went interrupted.  He wasn't where he was
17  supposed to be at a given point in time.
18  There are important meetings such as a
19  director level meeting that he was told to
20  attend and be on time to and was
21  subsequently late to.
22       There were leadership issues that I
23  was involved with as a third-party where he
24  had conflicts and confrontations with two

SHEA COURT REPORTING SERVICES
(617) 227-3097

**25**

1  Q.  What did Mr. Lyons say?

2  A.  I don't recall.

3  Q.  You have no memory at all?

4  A.  No memory at all.

5  Q.  Mr. Ward was upset that he had been called

6      Danny Boy?

7  A.  I don't know.

8  Q.  So why did you contact Mr. McGovern?

9  A.  He seemed indifferent over the aspect, and

10     I --

11 Q.  Who seemed indifferent?

12 A.  Mr. Ward, and I contacted Mr. McGovern

13     because I thought it was an inappropriate

14     statement.

15 Q.  What did Mr. McGovern say?

16 A.  He looked into it.

17 Q.  How do you know he looked into it?

18 A.  He initiated a case. Mr. Reed was notified

19     that the case was opened, and I think I saw

20     a summary of judgment, if you will, on his

21     case disposition.

22 Q.  What did that say?

23 A.  That he found no inappropriate conduct by

24     the union rep in this case.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**26**

1  Q.  No appropriate conduct?

2  A.  No inappropriate conduct.

3  Q.  No inappropriate conduct. Who, if anyone,

4      did Mr. McGovern speak to?

5  A.  I don't know.

6  Q.  Did he speak to Mr. Lyons?

7  A.  I don't know.

8  Q.  Did he speak to Mr. Ward?

9  A.  I don't know.

10 Q.  How did he investigate it?

11 A.  I don't know.

12 Q.  You don't know. Did Mr. Ward ever make a

13     complaint against you to Mr. McGovern?

14 A.  Yes, he did.

15 Q.  How did you learn of that?

16 A.  I was contacted by Mr. McGovern.

17 Q.  You were contacted by Mr. McGovern?

18 A.  Yes, I was.

19 Q.  By phone or in person?

20 A.  By phone.

21 Q.  Was this shortly after Mr. Ward made the

22     complaint?

23 A.  I'm not sure. I am not sure when he opened

24     the complaint.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**27**

1  Q.  Was the complaint -- are you aware that

2      Mr. Ward's complaint was in writing?

3  A.  Yes.

4  Q.  Did Mr. McGovern show you a copy of the

5      written complaint?

6  A.  No, I don't believe he did.

7  Q.  Did he summarize it to you over the

8      telephone?

9  A.  No. Well, no, he didn't summarize the

10     complaint to me, no.

11 Q.  What did Mr. McGovern tell you?

12 A.  He asked me questions.

13 Q.  What questions did he ask you?

14 A.  He asked me if I acted in a biased way

15     towards Mr. Ward. He asked me for some

16     documentation on any past less than

17     satisfactory management appraisals on any

18     other employee that was under my manage.

19     He asked if I had any other minorities

20     within my team. He asked for people who

21     could substantiate Mr. Ward's claim, peers,

22     co-workers.

23 Q.  What did you understand Mr. Ward's

24     complaints to be?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**28**

1  A.  I don't recall. I don't recall what the

2      complaint was.

3  Q.  You understood that Mr. Ward was complaining

4      of racial discrimination in how you were

5      treating him?

6  A.  Do I recall that?

7  Q.  Yeah.

8  A.  I don't think that came up during

9      Paul McGovern's interview with me.

10 Q.  What did you understand he was

11     complaining -- the basis of the complaint

12     was?

13 A.  There would be none.

14 Q.  What?

15 A.  There would be no basis to the complaint.

16 Q.  You're saying the complaint didn't have

17     merit. I'm not talking about merit now, I

18     am talking about what was the nature of the

19     complaint, as you understood it.

20 A.  I don't recall how I understood the nature

21     of the complaint from Mr. McGovern, if he

22     made such statements to me.

23 Q.  Did you understand there was some racial

24     component to Mr. Ward's complaint?

SHEA COURT REPORTING SERVICES
(617) 227-3097

29

1   A.   No.
2   Q.   No?  What kind of complaint does
3        Mr. McGovern have jurisdiction over?
4   A.   EEOC.
5   Q.   You understand that he has jurisdiction over
6        race, sex, age, religious discrimination,
7        things along that nature?
8   A.   Yes.
9   Q.   Did you understand Mr. Ward was complaining
10       about how you were treating him?
11  A.   Yes.
12  Q.   Was this complaint Mr. Ward made after you
13       gave him an evaluation, the spring of 2002?
14  A.   I don't recall.
15  Q.   Did you understand Mr. Ward complained
16       about the evaluation?
17  A.   Yes, he complained with me about the
18       evaluation.
19  Q.   Did you think that is what he complained to
20       Mr. McGovern about?
21  A.   I don't know.
22  Q.   You don't know.  Did you ever discuss the
23       complaint with Mr. Ward?
24  A.   The -- no, I did not.

SHEA COURT REPORTING SERVICES
(617) 227-3097

30

1   Q.   Did Mr. McGovern make any decision on that
2        complaint?
3   A.   Yes, he did.
4   Q.   What did he do?
5   A.   He found that there were management issues
6        only, no basis for any EEO complaint.
7   Q.   "He found that there were management
8        issues."  What does that mean?
9   A.   I think they were performance-related issues
10       with Mr. Ward that were based not on his
11       race, sex, color, creed, etcetera.
12  Q.   So then when you received Mr. McGovern's
13       finding on his investigation, you then, at
14       least, knew that Mr. Ward had been
15       complaining about racial discrimination?
16  A.   No, I didn't receive his finding.  I
17       received a phone call from my director
18       explaining that there was no basis for his
19       claim.
20  Q.   Your phone call from Mr. Reed --
21  A.   Yes.
22  Q.   00 when was that?
23  A.   I don't recall.  Sometime in 2002.
24  Q.   But you understood at that time at least

SHEA COURT REPORTING SERVICES
(617) 227-3097

31

1        that Mr. Ward had been complaining about
2        some sort of discrimination?
3   A.   Some sort of issue with treatment, yes.
4   Q.   Did you tell Mr. Ward in 2002 that you
5        thought he sucked?
6   A.   No.
7   Q.   Did you tell him that you thought he should
8        be laid off or RIF'd?
9   A.   No.
10  Q.   Did you have any managers who were laid off
11       or RIF'd during the year 2002?
12  A.   I had no managers working for me that were
13       laid off or RIF'd.
14  Q.   Do you know someone named Glenn MacPherson?
15  A.   I do.
16  Q.   Was he a manager that reported to you?
17  A.   Yes, he was.
18  Q.   You were friendly with him?
19  A.   We were not on ill terms.
20  Q.   Was Mr. MacPherson in fear of being left go
21       or RIF'd in 2002?
22  A.   Not to my knowledge.
23  Q.   Did he continue to work for you all during
24       2002?

SHEA COURT REPORTING SERVICES
(617) 227-3097

32

1   A.   For me directly, no.
2   Q.   Why did he leave your supervision?
3   A.   He pursued a vacancy in another
4        organization.
5   Q.   Did he do that because he was in danger of
6        losing his job?
7   A.   I don't know.
8   Q.   Didn't you tell Mr. Ward that Mr. MacPherson
9        was in danger of losing his job?
10  A.   I don't believe I did.
11  Q.   Wasn't it true that he was in danger of
12       losing his job?
13  A.   Not in my opinion.
14  Q.   Not in your opinion.  Weren't you told that
15       one of your managers was going to be let go
16       or RIF'd during 2002?
17  A.   Was I told that?
18  Q.   Yeah.
19  A.   No.
20  Q.   Did you understand that Mr. MacPherson
21       might be let go or RIF'd if he didn't find
22       another job?
23  A.   We all could be RIF'd, yes, I understood
24       that.

SHEA COURT REPORTING SERVICES
(617) 227-3097

```
                                    37                                         39
 1       as West Roxbury.                      1   A.   In November of 2002.
 2   Q.  These five or six managers in Metro South   2   Q.   Did you make that decision or Mr. Reed made
 3       all had to go out into the field and inspect 3       that decision?
 4       the work that their technicians were doing?  4   A.   It was a collection of thought between
 5   A.  Yes.                                   5        Mr. Reed and myself.
 6   Q.  You said that they would spend 40 percent of 6   Q.   What did Mr. Ward do that was inappropriate?
 7       their time doing that?                 7   A.   He didn't follow direction.
 8   A.  60 percent of the time.                8   Q.   Who gave him the direction?
 9   Q.  60 percent of the time.  Did these managers  9   A.   I did.
10       all have company vehicles?            10   Q.   What direction did you give him?
11   A.  No.                                   11   A.   I required him to be with me in Braintree
12   Q.  Why not?                              12        at 4:00 o'clock in the afternoon on a
13   A.  There was one manager who managed a group of 13        particular day.
14       20 employees that were not mobile in terms 14   Q.   How did you give him this direction, by
15       of vehicles.                          15        phone or in person?
16   Q.  You mean -- where would those 20 employees 16   A.   By phone.
17       work?                                 17   Q.   How did you communicate with Mr. Ward?
18   A.  At 185 Franklin Street, here in Downtown. 18   A.   When?
19   Q.  So that is where that manager worked also? 19   Q.   Well, you were his manager for a year and a
20   A.  Yes.                                  20        half, a year and two-thirds.  How did you
21   Q.  You mean when they were not mobile, they did 21        usually communicate with him during that
22       all their technical work at headquarters? 22        period?
23   A.  In terms of motor vehicles, they were not 23   A.   Usually?
24       mobile, they walked throughout the city. 24   Q.   Most often.
            SHEA COURT REPORTING SERVICES                SHEA COURT REPORTING SERVICES
                  (617) 227-3097                               (617) 227-3097
```

```
                                    38                                         40
 1   Q.  Because their work was all in Downtown   1   A.   Most often over the phone.
 2       Boston?                                2   Q.   Was that a cell phone?
 3   A.  Exactly.                               3   A.   Yeah, a cell phone, voicemail.
 4   Q.  As was their manager's?                4   Q.   He had a company-issued cell phone?
 5   A.  Yes.                                   5   A.   Yes.
 6   Q.  Did all the other -- did you assign these 6   Q.   You would call that number?
 7       different managers to different territories? 7   A.   Yes.
 8   A.  Yes.                                   8   Q.   Did you have your own cell phone you would
 9   Q.  What was Mr. Ward's specific territory? 9        call him from, or did you use a land-based
10   A.  Best of my recollection, Mr. Ward, at the 10        phone?
11       time, may have had some elements of Back 11   A.   Both.
12       Bay, Dorchester, Roxbury, Jamaica Plain, 12   Q.   So you say at some point you called
13       Hyde Park, and Milton.                13        Mr. Ward and told him to be in Braintree
14   Q.  Canton as well?                       14        at 4:00 o'clock?
15   A.  I don't think he had Canton as well.  15   A.   I relayed the message to him through my
16   Q.  So did all the managers of the technicians 16        manager's clerk.
17       who were in Metro South, did they all have 17   Q.   Manager's clerk?
18       vehicles except for the one assigned to 18   A.   That's correct.
19       Downtown Boston?                      19   Q.   What time of day was this?
20   A.  Yes.                                  20   A.   Roughly 3:00 o'clock in the afternoon.
21   Q.  Did there come a time that you suspended 21   Q.   Who was the manager's clerk?
22       Mr. Ward?                             22   A.   Patricia Comoletti.
23   A.  There did.                            23   Q.   Can you spell that last name?
24   Q.  When was that?                        24   A.   C-o-m-o-l-e-t-t-i.
            SHEA COURT REPORTING SERVICES                SHEA COURT REPORTING SERVICES
                  (617) 227-3097                               (617) 227-3097
```

45

1    plan was issued?
2  A.  Yes, it was.  No, that document was before
3      this particular discussion was to take place
4      in November, yes.
5  Q.  What caused you to issue Mr. Ward a
6      performance improvement plan in November of
7      2002?
8          MR. TELEGEN:  Paul, I think you're
9      not understanding this.  This was a periodic
10     CLEC meeting pursuant to the plan.
11 Q.  This was to review his performance on the
12     performance improvement plan?  Is that what
13     the purpose of summonsing him to Braintree
14     was?
15 A.  To review his performance while on the plan,
16     yes.
17 Q.  How often did you review his performance
18     while he was on the plan?
19 A.  I think there were three discussions.
20 Q.  Was this scheduled that it was supposed to
21     be at certain intervals, every 30 days or
22     something?
23 A.  On a regular basis, not set for 30 days.
24     There was flexibility built into the timing.

SHEA COURT REPORTING SERVICES
(617) 227-3097

46

1  Q.  All of those reviews were supposed to be
2      done in Mr. Reed's presence?
3  A.  No.
4  Q.  How many reviews had been done prior of this
5      kind prior to this day in November of 2002?
6  A.  Two.
7  Q.  How did it transpire that this review
8      in November was supposed to be done in
9      Mr. Reed's presence?
10 A.  Mr. Ward was coming toward the end of the
11     original performance improvement plan
12     length, and I asked Mr. Reed to be present
13     for this discussion, and it was an attempt
14     to ensure Dan fully understood what it was
15     that I was attempting to communicate with
16     him.
17 Q.  So when did you first raise that issue with
18     Mr. Reed?
19 A.  Which issue?
20 Q.  That you wanted him to be present for this
21     performance improvement discussion with
22     Mr. Ward.
23 A.  I don't recall.
24 Q.  Well, you were meeting with Mr. Reed

SHEA COURT REPORTING SERVICES
(617) 227-3097

47

1      throughout that day in Braintree in
2      November?
3  A.  That's correct.
4  Q.  Had you raised that issue that he should be
5      present at a meeting with you and Mr. Ward
6      before that day, or did you raise it on that
7      day?
8  A.  I don't recall.
9  Q.  You don't recall.  So why didn't you give
10     Mr. Ward any advance notice of this meeting
11     prior to 3:00 o'clock on that afternoon?
12 A.  I don't recall.
13 Q.  Is it your usual practice to summons people
14     at an hour's notice to a meeting --
15 A.  No.
16 Q.  -- at an unusual place?
17 A.  No.
18 Q.  This was a special occasion?
19         MR. TELEGEN:  Objection.  Answer,
20     was it a special occasion?
21 A.  It was a unique occasion.
22 Q.  What caused this unique occasion?  Was it
23     the fact that you and Mr. Reed were present
24     at the same time, and you also thought it

SHEA COURT REPORTING SERVICES
(617) 227-3097

48

1      would be something that you and Mr. Reed
2      should also be present when Mr. Ward was
3      spoken to?
4  A.  Mr. Ward had to be present when the review
5      discussion took place, number 1.  Number 2,
6      I had Mr. Reed at a certain location that
7      was logistically correct for us to meet on a
8      short-term notice.
9  Q.  How often did you meet with Mr. Reed in
10     person?
11 A.  Maybe monthly.
12 Q.  Once a month?
13 A.  You got it.
14 Q.  Did Mr. Ward have any notice you were
15     meeting with Mr. Reed that day prior to
16     3:00 o'clock that afternoon?
17 A.  Not to my recollection, no.
18 Q.  So you told Patricia to call Mr. Ward and
19     tell him what?
20 A.  That I want to see him in Braintree at
21     4:00 o'clock.
22 Q.  Did you give him an address?
23 A.  Yes.
24 Q.  Did you tell her to give Mr. Ward an

SHEA COURT REPORTING SERVICES
(617) 227-3097

53

1    or that evening.
2  Q.  Did you speak to him the next day?
3  A.  I would imagine I did, but I'm not entirely
4    sure.
5  Q.  What conversation did you have with Mr. Reed
6    about Mr. Ward not showing up prior to the
7    time you next spoke to Mr. Ward?
8  A.  We discussed the fact that he's not coming
9    or he hasn't shown up, and he's made no
10    attempt to contact me to give me a status as
11    to where he was.  We waited roughly two
12    hours for him to show, and we concluded the
13    evening.
14  Q.  Did you ever give any of your other managers
15    a demand that they show up for a meeting
16    with Mr. Reed on an hour's notice?
17  A.  No.
18  Q.  So it was either the next day or shortly
19    thereafter that you had a chance to speak to
20    Mr. Ward and find out why he wasn't at the
21    meeting at 4:00 o'clock as you believed he
22    was instructed; is that correct?
23  A.  Yes.
24  Q.  Tell me what you said to Mr. Ward about

SHEA COURT REPORTING SERVICES
(617) 227-3097

54

1    why he didn't come to the meeting at
2    4:00 o'clock and what Mr. Ward said to you.
3  A.  I don't recollect the specific conversation.
4  Q.  So you don't recall his explanation?
5  A.  No.
6  Q.  Why did you suspend him?
7  A.  Again, for not following direction, for not
8    answering my call, for not keeping me
9    updated as to where he was.
10  Q.  But did you decide to suspend him before or
11    after you got his explanation?
12  A.  It was after.
13  Q.  After.  You don't recall any of his
14    explanation?
15  A.  I don't.
16  Q.  Did you convey his explanation to Mr. Reed?
17  A.  He offered -- as I recall, there was no
18    discussion of an explanation until his
19    December performance review.
20  Q.  But didn't you ask him his explanation the
21    next day?
22  A.  Yes, I often asked Dan's explanations for
23    many things.
24  Q.  You just don't recall what the explanation

SHEA COURT REPORTING SERVICES
(617) 227-3097

55

1    was?
2  A.  Oftentimes when asked, he wouldn't give me
3    an explanation.
4  Q.  I'm not talking about oftentimes, I am
5    talking about this specific time.
6  A.  I don't recollect his specific explanation
7    as to why he didn't meet me in Braintree at
8    4:00 o'clock that afternoon.
9  Q.  But you weren't satisfied with the
10    explanation?
11  A.  Absolutely not.
12  Q.  Did you tell that to Mr. Reed?
13  A.  I am sure we had that discussion.
14  Q.  You recommended that disciplinary action be
15    taken against Mr. Ward for not coming to the
16    meeting at 4:00 o'clock?
17  A.  Yes.
18  Q.  What did Mr. Reed say?
19  A.  He concurred with the plan of action.
20  Q.  What was the plan of action?
21  A.  A one-day suspension for not following
22    direction.
23  Q.  The meeting, then, the performance
24    improvement meeting with you and Mr. Reed

SHEA COURT REPORTING SERVICES
(617) 227-3097

56

1    and Mr. Ward took place the next month?
2  A.  Yes.
3  Q.  Was that at 300 Granite Street in Braintree?
4  A.  No.
5  Q.  Was that 173 Boston Street in Dorchester?
6  A.  No.
7  Q.  125 High Street in Boston?
8  A.  No.
9  Q.  Where was it?
10  A.  900 Chelmsford Street, Floor 3, in Lowell,
11    Massachusetts.
12  Q.  How much notice did Mr. Ward get before
13    being told to go to Lowell?
14  A.  I don't recall.
15  Q.  How was it he was told about the meeting in
16    Lowell?
17  A.  He was told by me personally.
18  Q.  What did you tell him?
19  A.  That we'll meet to discuss the terms of his
20    PIP review.
21  Q.  You gave him at least 24-hours' notice?
22  A.  I don't recall.
23  Q.  Were there other times you gave Mr. Ward
24    less than 24-hours' notice to attend any

SHEA COURT REPORTING SERVICES
(617) 227-3097

**61**

1  A.  I'm not sure if he used his own sedan or if
2      he used a van.
3  Q.  Did he continue to use the subway?
4  A.  I don't believe he did.
5  Q.  How do you know that?
6  A.  I don't.
7  Q.  Did you speak to him about it?
8  A.  I made sure that he was efficiently getting
9      from job to job.
10  Q.  How did you do that?
11  A.  Through a discussion.
12  Q.  Tell me the discussion.
13  A.  The discussion was, "Dan, you know you have
14      vans available to you should you need them."
15  Q.  What did he say?
16  A.  "Okay."
17  Q.  That was the extent of your discussion?
18  A.  As I recall.
19  Q.  But you don't remember ever asking him why
20      he was taking the subway that day as opposed
21      to using a company vehicle?
22  A.  No, I don't recall ever asking him that
23      question.
24  Q.  Why was Mr. Ward discharged from the

SHEA COURT REPORTING SERVICES
(617) 227-3097

**62**

1      company?
2  A.  In my mind, because he stopped showing up
3      for work, it was abandonment of job.
4  Q.  Is it normal practice to fire someone for
5      abandoning the job who is sick and calls in
6      sick?
7  A.  Not to my knowledge.
8  Q.  Didn't Mr. Ward call in sick?
9  A.  Yes, he did.
10  Q.  So then why was he fired when he called in
11      sick and didn't come to work?
12  A.  He never maintained any communication with
13      me letting me know what was going on, no
14      status, no update.
15  Q.  At some point you were notified that
16      Mr. Ward was claiming that he was ill?
17  A.  At some time I found out that Mr. Ward was
18      claiming he was ill, yes.
19  Q.  And that he had migraines?
20  A.  No.
21  Q.  You didn't know he had migraines?
22  A.  I had no idea that he had migraines.
23  Q.  That he was claiming he was sick?
24  A.  I had learned that he had claimed that he

SHEA COURT REPORTING SERVICES
(617) 227-3097

**63**

1      was sick.
2  Q.  How did you learn that?
3  A.  From a phone call to the absence reporting
4      center.
5  Q.  What's the absence reporting center?
6  A.  They're, I believe, a vendor that works on
7      Verizon's behalf to administer absence.
8  Q.  When you say "they're a vendor," that means
9      it's an outside company, it's not Verizon
10      employees maintaining the center?
11  A.  That is my understanding.
12  Q.  Why does Verizon use an outside vendor to
13      have employees report their absences?
14      MR. TELEGEN:  Objection.
15  A.  I don't know.
16  Q.  You have no idea?
17  A.  I have no idea.
18  Q.  Is there any efficiencies that are utilized
19      by having an outside vendor?
20      MR. TELEGEN:  Objection.
21  A.  I have no idea.
22  Q.  So if an employee is going to be absent
23      because they're sick, are they supposed to
24      call you or the outside vendor?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**64**

1  A.  Both.
2  Q.  Both.  Did you ever speak to Mr. Ward after
3      he called in sick for the first time?
4  A.  Yes.
5  Q.  How often, how long after Mr. Ward called in
6      sick did you speak to him?
7  A.  I would have to look at my records to see
8      the exact date.
9  Q.  Approximately?
10  A.  Weeks.
11  Q.  Weeks.  How long after Mr. Ward stopped
12      showing up to work were you notified by the
13      absence reporting center that he had called
14      in sick there?
15  A.  I was never notified by the absence
16      reporting center that he had called in sick.
17      I inquired of the ARC.
18  Q.  To see if he had called in sick?
19  A.  Yes.
20  Q.  How long after Mr. Ward had not been
21      appearing for work did you contact the ARC?
22  A.  He did not show up for work on
23      February 20th, and I contacted the ARC
24      approximately March 3rd.

SHEA COURT REPORTING SERVICES
(617) 227-3097

65

1  Q.  March 3rd. What caused you to do that?
2  A.  Just to double-check to see where he may
3      have been, cover all bases.
4  Q.  Did you ever speak to Mr. Ward at any time
5      on or after February 20th?
6  A.  Yes.
7  Q.  When was that?
8  A.  It was weeks after February 20th, and I
9      don't know the exact date. It is in my
10     records.
11 Q.  Was it before or after March 3rd?
12 A.  It may have been -- I'm not sure. It may
13     have been before.
14 Q.  Sometime between February 20th and March 3rd
15     you spoke to Mr. Ward?
16 A.  May have.
17 Q.  You think so?
18 A.  I could check my record.
19 Q.  How did you happen to speak to Mr. Ward?
20 A.  I called him on the phone, cell phone that
21     has been provided to him, and he answered
22     the phone.
23 Q.  Tell me the conversation you had with
24     Mr. Ward.

SHEA COURT REPORTING SERVICES
(617) 227-3097

66

1  A.  I don't recall the exact context, it's in my
2      notes, but to the best of my recollection I
3      said, "Dan, where are you?" He said, "I am
4      not at work, I am sick," and he then said
5      that he left me a message to that extent.
6      And I told him that I hadn't received any
7      such message from him, that I had no idea
8      where he was, and that I wanted him to call
9      me from a land line.
10 Q.  A land line?
11 A.  A land line.
12 Q.  What does that mean, a non-cell phone?
13 A.  Yes.
14 Q.  Was that the extent of your whole
15     conversation?
16 A.  That captures the major point of the whole
17     conversation.
18 Q.  Why did you tell him to call you from a land
19     line?
20 A.  He was speaking very softly. I couldn't
21     understand fully exactly what he was saying.
22     I got the feeling that I may have just woken
23     him up, and I wanted to make sure there was
24     no problem with our communication in terms

SHEA COURT REPORTING SERVICES
(617) 227-3097

67

1      of poor reception.
2  Q.  Was this the first time you had tried to
3      contact Mr. Ward since February 20th?
4  A.  No.
5  Q.  How many times did you attempt to contact
6      Mr. Ward?
7  A.  Several.
8  Q.  How many is several?
9  A.  More than a couple.
10 Q.  More than a couple. You mean approximately
11     three to five?
12 A.  More.
13 Q.  More than five times?
14        (Witness nodding his head
15     affirmatively.)
16 Q.  You have to say yes instead of nodding.
17 A.  Yes.
18 Q.  How did you make these attempts to contact
19     Mr. Ward?
20 A.  Many attempts through his primary pager, his
21     secondary pager, the foreman-in-charge
22     pager, all three of which were in his
23     control. His cell phone, his home phone at
24     55 Weybosset Street, by personally driving

SHEA COURT REPORTING SERVICES
(617) 227-3097

68

1      to his house, driving to his house in the
2      company of another area manager, leaving my
3      business card affixed to his door on more
4      than one event, posting letters to his door,
5      sending letters to him through the U.S.
6      Postal Service.
7  Q.  Did you know whether Mr. Ward was staying at
8      55 Weybosset Street?
9  A.  I did not know where he was staying.
10 Q.  Did you ever have a conversation with him
11     where he told you that the pipes froze at
12     55 Weybosset Street?
13 A.  No.
14 Q.  You never heard that before his deposition
15     two weeks ago?
16 A.  I heard him say he's got a problem with his
17     pipes, he has to go fix busted pipes. Never
18     said they froze, never said where they were.
19 Q.  Who's the area manager you went over to
20     55 Weybosset Street with?
21 A.  Thomas Brown.
22 Q.  Did you knock on the door?
23 A.  Yes.
24 Q.  Was there an answer?

SHEA COURT REPORTING SERVICES
(617) 227-3097

73

1    phone, they provide it.
2  Q.  Do you know if Mr. Ward had voicemail
3    capacity on his cell phone?
4  A.  I don't believe he did.
5  Q.  Why not?
6  A.  I don't know.
7  Q.  Did you ever ask him that?
8  A.  No.
9  Q.  Hadn't you been calling him on his cell
10   phone for a year and a half?
11  A.  Yes.
12  Q.  You didn't always reach him?
13  A.  He had a pager.  He had a second pager.
14  Q.  So in other words, if you called the cell
15   phone and you didn't get an answer, you
16   wouldn't leave a message on the cell phone,
17   you would contact one of his pagers; is that
18   what you would do?
19  A.  I would find him.
20  Q.  You couldn't leave a message?
21       MR. TELEGEN:  The problem with your
22   question is the order in which you're going.
23   Your assumption is you call on the cell
24   phone first and then you page him.  Your

SHEA COURT REPORTING SERVICES
(617) 227-3097

74

1    assumption may or may not be correct.
2  Q.  Isn't that what happens sometimes?
3  A.  I don't know.
4  Q.  When you tried to get ahold of Mr. Ward
5    prior to February of 2003, did you usually
6    call him on his cell phone, or did you
7    usually page him?
8  A.  Could be either.
9  Q.  How many more attempts did you make to call
10   Mr. Ward on his cell phone?
11  A.  I would have to refer to my notes.
12  Q.  You don't remember?
13  A.  Not off the top of my head.
14  Q.  What happened on these other attempts?
15  A.  I don't recall.
16  Q.  Did you ever speak to Mr. Ward again?
17  A.  No.
18  Q.  Did he leave you messages?
19  A.  Never.
20  Q.  Never.  How would he call you when he called
21   you?
22  A.  He had my home phone number, he had my work
23   phone number, my work voicemail, my cell
24   phone number, my pager number.  My pager has

SHEA COURT REPORTING SERVICES
(617) 227-3097

75

1    voicemail.
2  Q.  You had no voicemail messages from
3    Mr. Ward?
4  A.  Absolutely not.
5  Q.  So at some point in this process you decided
6    to contact the absence reporting center; is
7    that what it's called?
8  A.  Yes.
9  Q.  You used the initials ARC?
10  A.  I did.
11  Q.  What did the ARC tell you?
12  A.  That he had reported an absence on
13   February 20th, and that he again attempted
14   to report the absence on March 2nd or 3rd
15   with the incorrect initial date being input.
16  Q.  What happened?  What did you do after you
17   received that information from the absence
18   reporting center?
19  A.  I worked back through Mr. Reed and Mary
20   O'Leary in human resources to figure out our
21   next course of action.
22  Q.  Had any paperwork been provided to the
23   absence reporting center by Mr. Ward?
24  A.  At that time there were no FMLA documents on

SHEA COURT REPORTING SERVICES
(617) 227-3097

76

1    hand with the ARC.
2  Q.  What is an FMLA document?
3  A.  I'm not sure.
4  Q.  You're not sure.  If somebody reports an
5    absence to the absence reporting center and
6    it's going to be an extended absence,
7    they're supposed to apply for FMLA leave?
8  A.  No.  An FMLA is an act that allows an
9    employee to obviously be out sick, but not
10   as a result of that illness and that absence
11   be disciplined.
12  Q.  How does that work?  How does the employee
13   obtain FMLA leave?
14  A.  As I understand it, the ARC will send an
15   application for FMLA consideration to the
16   employee's home address.
17  Q.  Did the ARC send that to Mr. Ward?
18  A.  Yes.
19  Q.  How do you know that?
20  A.  The ARC, I believe, gave a communication
21   back to me and told me that the forms were
22   mailed.
23  Q.  Did you speak to an individual at the ARC?
24  A.  I did.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**77**

1  Q.  Who was that?
2  A.  I don't recall.
3  Q.  What did this individual tell you?
4  A.  That Mr. Ward had contacted the ARC on two
5      occasions, and that forms were mailed, but
6      nothing has been returned.
7  Q.  At that point in time you decided to bring
8      this information to Mr. Reed?
9  A.  And Mary O'Leary.
10  Q.  Together or separately?
11  A.  Separately.
12  Q.  Who did you speak to first?
13  A.  I don't recall.
14  Q.  What did you tell Ms. O'Leary?
15  A.  I reviewed with Miss O'Leary the status of
16      Dan's absence, made her know that I wasn't
17      aware of his presence, made her aware of the
18      fact that he hadn't maintained any
19      communication with me as to where he is or
20      what is going on, a communication that is
21      substantive, and asked her for further
22      guidance.
23  Q.  Did you tell her that you had left
24      voicemail messages for him?

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**78**

1  A.  No.
2  Q.  You omitted to tell her that?
3  A.  He never left me a voicemail message.
4  Q.  So you told her that he was not coming to
5      work, and he hadn't contacted you, and you
6      tried to contact him, and that he had
7      contacted the absence reporting center?
8  A.  Say that one more time for me, please?
9  Q.  You told Ms. O'Leary that 1, Mr. Ward wasn't
10      coming to work; 2, he hadn't contacted you;
11      3, you had been trying to contact him in
12      vein; and 4, he had contacted the ARC?
13  A.  Yes.
14  Q.  Anything else you told Ms. O'Leary?
15  A.  Not to my recollection.
16  Q.  What did she tell you?
17  A.  That she was going to look to see what your
18      next course of action would be, that she
19      would be in touch with her director,
20      Julie Patterson, and seek guidance through
21      our management disciplinary committee as to
22      what they think is an appropriate course of
23      action to take in this case, and that she
24      would get back to me.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**79**

1  Q.  Anything else you told her about Mr. Ward in
2      this conversation?
3  A.  Mary O'Leary knew at the time that Mr. Ward
4      was on a performance improvement plan.
5  Q.  How did you know she understood that?
6  A.  She has to be involved in that whole process
7      from its initiation, so back in July of
8      2002, actually prior to July of 2002 she was
9      involved with Mr. Ward from a developmental
10      aspect, just because of the fact in the
11      performance year 2001 he was an overall in
12      need of improvement for his appraisal.
13  Q.  Did you discuss that with her in February or
14      March of 2003?
15  A.  She was aware that he was on an improvement
16      performance plan.
17  Q.  Did you discuss that with her, or are you
18      just assuming it?
19  A.  We discussed it.
20  Q.  What did you discuss about it?
21  A.  She knew that Dan was on a performance
22      improvement plan, and outside of that, I'm
23      not sure if there was much of any
24      discussion.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

**80**

1  Q.  Did she get back to you after talking to her
2      superior?
3  A.  Yes.
4  Q.  What did she tell you?
5  A.  She communicated with both Mr. Reed and I
6      that the recommendation from the MDC was
7      that we should proceed with letters
8      informing Dan that he should return to
9      work, and that I should -- she drafted a
10      letter -- I should post the letter on Dan's
11      door -- I'm sorry -- that I should mail this
12      letter through the post office certified
13      mail to Mr. Ward, and as a contingency we
14      should follow that up with a hand-delivered
15      letter, which I did, and left on his front
16      door.
17  Q.  At 55 Weybosset Street?
18  A.  At 55 Weybosset Street.
19  Q.  Did you put the letter on his front door?
20  A.  I did.
21  Q.  Was anyone with you when you did that?
22  A.  There was.
23  Q.  Who was that?
24  A.  Mr. Brown.

SHEA COURT REPORTING SERVICES
(617) 227-3097

---

81

1    Q.   Did you knock on the door at the time?
2    A.   I did.
3    Q.   Did anybody answer?
4    A.   No.
5    Q.   Was there any sign that Mr. Ward was
6         present at the time you came there to
7         post the notice on his door?
8    A.   The front door was open.
9    Q.   And you knocked and nobody answered?
10   A.   That's correct.
11   Q.   Did you say hello or anything else to see if
12        anyone was there?
13   A.   Yes, I did.
14   Q.   Did you get a response?
15   A.   No, I did not.
16   Q.   This letter told Mr. Ward to contact you?
17   A.   Yes, it did.
18   Q.   It was signed by you?
19   A.   I believe it was.
20   Q.   Even though it was drafted by human
21        resources, it was to go out under your
22        signature?
23   A.   Yes, I believe that's the case.
24   Q.   Did you receive any communication from

SHEA COURT REPORTING SERVICES
(617) 227-3097

82

1         Mr. Ward?
2    A.   No.
3    Q.   Are you sure about that?
4    A.   Absolutely.
5    Q.   How long did you wait after sending him the
6         letter and posting it on his door before you
7         had a further communication with anybody,
8         either Miss O'Leary or Mr. Reed, about this
9         situation?
10   A.   I would say it was within a matter of days.
11        I would have to refer to my notes to give
12        you the exact --
13   Q.   So you think it was several days later?
14   A.   Yes.
15   Q.   Who did you speak to, Miss O'Leary or
16        Mr. Reed?
17   A.   I don't recall.
18   Q.   But you told somebody that "We sent a letter
19        out to Mr. Ward, and we put a notice on his
20        door, and we still haven't heard back from
21        him"?
22   A.   That's correct.
23   Q.   What were you told to do then?
24   A.   More investigation to find out if we can

SHEA COURT REPORTING SERVICES
(617) 227-3097

83

1         ascertain where Mr. Ward was.  Mr. Reed was
2         in touch with our security department to
3         find out if there was any further action
4         that could be taken to find out if Dan was
5         hospitalized or whatever the reason was that
6         Dan couldn't come to work.
7    Q.   Mr. Reed asked security to look into this?
8    A.   Yes.
9    Q.   Did he get any response from that?
10   A.   I believe he did.
11   Q.   What did Mr. Reed tell you he had uncovered?
12   A.   I had seen in the form of a Lotus note
13        e-mailed the director, Bob Jacobs, had
14        stated to Mr. Reed that he had -- Mr. Reed
15        had done everything that the security
16        department would do to pursue Dan's
17        whereabouts.
18   Q.   In other words, it came up negative, nobody
19        found his whereabouts?
20   A.   Security made, in my mind, my estimation or
21        interpretation of that e-mail, security made
22        no further attempt to ascertain his
23        whereabouts.
24   Q.   Did they make any attempt at all?

SHEA COURT REPORTING SERVICES
(617) 227-3097

84

1    A.   I don't know.
2    Q.   Did you check back with ARC to find out
3         whether paperwork had come in from Mr. Ward
4         or they had further communications from
5         Mr. Ward?
6    A.   Not to my recollection.
7    Q.   Why didn't you do that?
8    A.   I may have.
9    Q.   You may have, you're not sure?
10            (Witness nodding his head
11        affirmatively.)
12            MR. TELEGEN:  Witness nodded
13        affirmatively.
14   Q.   How did Mr. Ward come to be discharged?
15   A.   Mr. Reed drafted a letter with the
16        assistance of human resources, and the
17        letter was sent out through, I believe,
18        registered mail to Mr. Ward's residence at
19        55 Weybosset Street that he'd be terminated
20        for job abandonment.
21   Q.   If Mr. Ward had contacted you and said that
22        he had been suffering severe migraines, he
23        was under doctor's care, and he was in the
24        process of applying for FMLA leave, would he

SHEA COURT REPORTING SERVICES
(617) 227-3097

85

1 have been discharged?
2      MR. TELEGEN: Objection.
3 A. I can't fully answer the question, but in my
4    own opinion he would absolutely not have
5    been discharged.
6 Q. The biggest problem, then, was Mr. Ward
7    failed to contact you during this period?
8 A. That was the biggest gap in my mind, yes.
9 Q. Do you recall answering interrogatories in
10    this action?
11 A. Yes.
12 Q. The interrogatories to Verizon, you signed
13    them, as well as to ones sent to you
14    individually?
15 A. Yes.
16 Q. Interrogatory 11 I asked Verizon to state
17    completely each and every reason why
18    Defendant discharged Plaintiff from its
19    employ in approximately March of 2003, and
20    you wrote, or the company wrote and you
21    signed, that Plaintiff abandoned his job
22    by failing to appear for scheduled workdays
23    and making an apparently misleading
24    statement about the basis for his absence.

SHEA COURT REPORTING SERVICES
(617) 227-3097

86

1       What misleading statement did
2    Mr. Ward make about the basis for his
3    absence?
4 A. The statement -- the understanding was that
5    he was out sick and healing from health.
6 Q. What was misleading about that or incorrect?
7 A. Our records show the address, which he is
8    obligated to provide, that his home address
9    is 55 Weybosset Street. Several attempts
10    were made to try to reach him at that
11    location, and it was never fruitful.
12 Q. It's your opinion that Mr. Ward was not at
13    55 Weybosset Street, but was somewhere else?
14 A. It's my opinion that he wasn't at
15    55 Weybosset Street.
16 Q. Who told you that Mr. Ward was at home, sick
17    and healing? How did you find that out?
18 A. Nobody told me he was at home, sick and
19    healing.
20 Q. You just told me that was the misleading
21    statement.
22 A. That is the understanding, if he is indeed
23    out sick, you are at home healing, or
24    communicate to me with where you are healing

SHEA COURT REPORTING SERVICES
(617) 227-3097

87

1    from so I can then follow-up with you to
2    have regular conversation as to what the
3    status of your illness is and when you will
4    be available to return to work.
5 Q. If Mr. Ward made any false statement --
6    because this answer apparently indicates he
7    made some false statement in relation to his
8    absence -- I am trying to find out what the
9    false statement is.
10      MR. TELEGEN: Want to ask the
11    witness what Mr. Ward said to Mr. Reed when
12    he was first absent? You might get an
13    answer.
14 Q. What did Mr. Ward say in connection with his
15    absence?
16 A. He told me that he needed time off to fix
17    his busted pipes.
18 Q. When was this?
19 A. On February 19th.
20 Q. On February 19th, the day you had the
21    conversation with him about the busted
22    pipes, is that the day you spoke with him
23    about the busted pipes?
24 A. That's the day.

SHEA COURT REPORTING SERVICES
(617) 227-3097

88

1 Q. Tell me the conversation you had with
2    Mr. Ward on February 19th.
3 A. Mr. Ward was told to come into my office.
4    We had a discussion about the fact that he
5    once again failed to keep his calendar
6    straight; that he once again failed to
7    coordinate the activities of his crew in his
8    absence; and then he went on to explain to
9    me that he needed some time off. And I
10    said, "Dan, what do you need? What is going
11    on?" He said that he's got some busted
12    pipes, and I said, "Well, coordinate with
13    Patti Comoletti the days that you need off,
14    and we'll see what we can do to
15    accommodate."
16      At that time he walked out of my
17    office, and we never had a substantial
18    conversation since then.
19 Q. Did he indicate to you how much time off he
20    needed to fix his pipes?
21 A. A couple of days.
22 Q. So the first few days that he was absent,
23    you assumed he was out because he was
24    attending to that matter?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**89**

1  A.  Yes.
2  Q.  So it was only later that you had any
3      indication that he was out due to an illness
4      problem?
5  A.  Yes.
6  Q.  Did you ever learn that Mr. Ward had been
7      granted FMLA leave?
8  A.  Eventually, yes.
9  Q.  How did you learn that?
10  A.  Amy Seaver, from our corporate lawyer's
11      office, advised me of it.
12  Q.  This was before or after Mr. Ward brought
13      this lawsuit?
14  A.  After.
15  Q.  So you never knew, back in March, April, May
16      June of 2003, that Mr. Ward had been granted
17      the FMLA leave?
18  A.  That's correct.
19  Q.  Is that the way Verizon operates, that if
20      one vendor, what you call a vendor, grants
21      FMLA leave, that the supervisor is not
22      informed of that?
23      MR. TELEGEN:  Objection.
24  A.  I don't know.
SHEA COURT REPORTING SERVICES
(617) 227-3097

**90**

1  Q.  You don't know whether -- how do managers
2      know whether their employees have been
3      granted FMLA?
4  A.  We are notified electronically by the ARC or
5      our FMLA coordinator.
6  Q.  Routinely you're notified by e-mail when an
7      employee has been granted FMLA leave?
8  A.  Yes.
9  Q.  But it didn't happen in this case?
10  A.  No.
11  Q.  Do you know why?
12  A.  No, I don't know why.
13  Q.  Do you have an opinion as to probably why it
14      happened, even if you are not certain of
15      that?
16  A.  No.
17  Q.  You have no idea?  You just acted like you
18      were about to answer.  You had some notion
19      that you weren't sure of, so you didn't want
20      to answer me definitely?  What do you think
21      was the reason?
22  A.  That I wasn't notified that he was or was
23      not FMLA approved?  Restate the question?
24  Q.  Why do you think you weren't notified that
SHEA COURT REPORTING SERVICES
(617) 227-3097

**91**

1      he had been approved for an FMLA leave?
2  A.  Because he was no longer an employee of
3      Verizon.
4  Q.  What safeguards, if any, does Verizon have
5      to ensure that employees that were out sick
6      applying for FMLA leave are not terminated
7      before a decision is made on their FMLA
8      application?
9  A.  I'm not sure.
10      MR. MANOFF:  I will take a break
11  for a minute.
12      (Whereupon there is a brief
13  recess.)
14      MR. MANOFF:  Just another question
15  or two, Mr. Shea.
16  Q.  Isn't it Verizon's practice when an employee
17      requests FMLA leave from the ARC, that the
18      ARC routinely notifies the supervisor of the
19      employee of that?
20  A.  One more time?  I'm sorry.
21  Q.  Isn't it Verizon's practice that when an
22      employee contacts the ARC seeking FMLA
23      leave, that the ARC notifies the supervisor
24      of the employee, by e-mail or otherwise,
SHEA COURT REPORTING SERVICES
(617) 227-3097

**92**

1      that the employee has just applied for FMLA
2      leave?
3  A.  If I ask to do it -- one more time.  Could
4      you -- let me see if I can answer that
5      without you going through it three times.
6      Our ARC does not wait for an employee to
7      request FMLA documentation.  Our ARC
8      immediately mails to the employee's home
9      address the FMLA application.
10  Q.  That is not my question.  Try again.
11      MR. TELEGEN:  He's answering your
12  question as it relates to hourly employees.
13  Then there is a routine in place by which
14  when the ARC gets contacted by the hourly
15  employee, the supervisor is contacted by the
16  ARC if the process is working properly.
17      THE WITNESS:  That's correct.
18      MR. TELEGEN:  As it relates to
19  management employees, I won't suggest it's
20  quite so clearcut, but the system that
21  Mr. Ward would be with is the one that you
22  stated.
23      THE WITNESS:  Yes.
24      MR. TELEGEN:  If one of his former
SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 1**

Pages: 1-28
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A.#:  1228-RCL
+ + + + + + + + + + + + + +
DANIEL WARD,
        Plaintiff
VS.
VERIZON CORPORATION and MICHAEL B. SHEA,
        Defendants
+ + + + + + + + + + + + +

        DEPOSITION OF MARY O'LEARY, a
vitness called by and on behalf of the
Plaintiff, pursuant to the provisions of the
Federal Rules of Civil Procedure, before
Joan Applegate, a Certified Shorthand
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Lav
Offices of Paul Manoff, Esq. 47 Winter
Street, Boston, Massachusetts, on Tuesday,
October 26, 2004 commencing at 2:00 p.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 2**

APPEARANCES:

Paul Manoff, Esq.
47 Winter Street
Boston MA 02108
On behalf of the Plaintiff;

Arthur G. Telegen, Esq.
Matthev L. Adams, Esq.
Foley, Hoag, LLP
155 Seaport Boulevard
Boston MA 02210-2600
On behalf of the Defendants.

ALSO PRESENT:
Daniel Ward, Plaintiff
Michael Shea, Defendant

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 3**

              I N D E X

DEPONENT
  Mary O'Leary
EXAMINATION                          PAGE
  (By Mr. Manoff)                     4

            E X H I B I T S
NO.           DESCRIPTION            PAGE
None

SHEA COURT REPORTING SERVICES
(617) 227-3097

**Page 4**

              S T I P U L A T I O N S
        It is hereby stipulated and agreed
by and between counsel for the respective
parties that the sealing, filing, and
certification of the deposition are waived.
        It is further stipulated and agreed
by counsel that all objections, except as to
the form of the question, are reserved until
the time of trial.  Motions to strike are
reserved until the time of trial of other
evidentiary use of the transcript.
        The witness exercises her right to
read the transcript and sign the original
signature page under the pains and penalties
of perjury.  If the transcript is not signed
vithin 30 days of receipt thereof, it is
deemed accurate.
        MARY O'LEARY, having duly affirmed
that her testimony vould be the truth, the
whole truth, and nothing but the truth,
testified as follows in answer to direct
interrogatories:
BY MR. MANOFF:
Q.  Please state your full name.

SHEA COURT REPORTING SERVICES
(617) 227-3097

```
                                    5
 1   A.   Mary O'Leary.
 2   Q.   What is your address, Ms. O'Leary?
 3   A.   46 Endicott Street in Quincy, Mass.
 4   Q.   Who are you employed by?
 5   A.   Verizon.
 6   Q.   What is your position?
 7   A.   Human resources business partner.
 8   Q.   Human resources business partner?
 9   A.   Yes.
10   Q.   What does that mean?
11   A.   I really don't know, just a title.
12   Q.   What do you do?
13   A.   I support the New England region in all
14        human resource issues.
15   Q.   How long have you held that position?
16   A.   Off and on for 15 years.
17   Q.   Do you have a college degree?
18   A.   Yeah.
19   Q.   In human resources --
20   A.   No, management.
21   Q.   -- or some related field?  How long have you
22        worked for Verizon or its predecessors?
23   A.   29 years.
24   Q.   Did you ever meet the plaintiff, Mr. Ward?
              SHEA COURT REPORTING SERVICES
                      (617) 227-3097
```

```
                                    6
 1   A.   No.
 2   Q.   No.  Did you ever speak to anyone in Verizon
 3        about Mr. Ward?
 4   A.   Yes.
 5   Q.   Who did you speak to about Mr. Ward?
 6   A.   Mike Shea.
 7   Q.   Anyone else?
 8   A.   Juliette Patterson.
 9   Q.   Who is Juliette Patterson?
10   A.   She works in the employee relations
11        department.
12   Q.   What caused you to speak to Juliette
13        Patterson about Mr. Ward?
14   A.   When we were taking action on any management
15        employee, it goes in front of that committee
16        to make sure it's done consistently.
17   Q.   What action was being taken in regard to
18        Mr. Ward that caused you to speak to
19        Juliette Patterson?
20   A.   Well, writing a letter for him to return to
21        work or else he would be terminated for job
22        abandonment.
23   Q.   What conversation did you have with
24        Ms. Patterson?
              SHEA COURT REPORTING SERVICES
                      (617) 227-3097
```

```
                                    7
 1   A.   Told her what we were planning on doing, and
 2        got her concurrence that that would be the
 3        appropriate action.
 4   Q.   Any further conversation you had with her
 5        about Mr. Ward?
 6   A.   Not that I can recall.
 7   Q.   Anyone else you spoke to in Verizon about
 8        Mr. Ward?
 9   A.   Not that I can recall.
10   Q.   Are you aware that Mr. Ward filed an EEO
11        complaint against Mr. Shea?
12   A.   Did I know that?
13            MR. TELEGEN:  Objection.  This case
14        or something else?
15            MR. MANOFF:  Not this case, but
16        while he was still at Verizon.
17   Q.   Do you know who Mr. McGovern is?
18   A.   Yeah.
19   Q.   EEO officer?
20   A.   Um-hum.
21   Q.   Yes?  You have to answer yes.
22   A.   Yes.
23   Q.   Were you aware that Mr. Ward went to
24        Mr. McGovern to file an EEO complaint
              SHEA COURT REPORTING SERVICES
                      (617) 227-3097
```

```
                                    8
 1        against Mr. Shea?
 2   A.   No.
 3   Q.   You never heard that?
 4   A.   No.
 5   Q.   Mr. Shea didn't disclose that to you at the
 6        time he was discussing Mr. Ward with you?
 7   A.   Not that I recall.
 8   Q.   When did Mr. Shea first discuss Mr. Ward
 9        with you?
10   A.   I don't remember the date.  It was last
11        year, 2003 first quarter, end of February
12        maybe, middle of February, around there.
13   Q.   What was the nature of -- Mr. Shea contacted
14        you?
15   A.   Correct.
16   Q.   What did Mr. Shea tell you about Mr. Ward?
17   A.   That he hadn't heard from him and didn't
18        know where he was.  At this point it had
19        been a while.
20   Q.   This is the first time that Mr. Shea ever
21        contacted you about Mr. Ward?
22   A.   About this situation, yes.
23   Q.   About any situation involving Mr. Ward?
24   A.   No.
              SHEA COURT REPORTING SERVICES
                      (617) 227-3097
```

13

1  Q.  But do you speak to the person who's the
2      subject of the performance improvement plan?
3  A.  No.
4  Q.  So you had no way of knowing that Mr. Shea
5      had been the subject of an EEO complaint
6      because he didn't disclose that to you?
7  A.  Correct.
8  Q.  If you had known it, you wouldn't have done
9      anything differently anyway?
10 A.  Probably not.
11 Q.  Did Mr. Shea keep in touch with you insofar
12     as Mr. Ward's progress on the performance
13     improvement plan?
14 A.  Yes.
15 Q.  What did he tell you?
16 A.  We extended it, I remember.
17 Q.  Anything else he told you?
18 A.  I can't recall.
19 Q.  Were you aware that Mr. Shea suspended
20     Mr. Ward because Mr. Ward didn't come to
21     a meeting?  Did you ever hear that before?
22 A.  I don't remember.
23 Q.  So the next time you remember discussing
24     Mr. Ward was when Mr. Shea told you he

SHEA COURT REPORTING SERVICES
(617) 227-3097

14

1      wasn't reporting to work?
2  A.  Correct.
3  Q.  What did Mr. Shea tell you?
4  A.  That he had told him he had some broken
5      pipes and was going to take a couple of days
6      vacation -- and I don't remember the time
7      frame, but this might have been two and a
8      half weeks later -- and still had not heard
9      from him.
10 Q.  That's all Mr. Shea told you?
11 A.  That's all I can recall.
12 Q.  Did Mr. Shea tell you about any attempts he
13     had made to contact Mr. Ward?
14 A.  Made numerous attempts to contact him.
15 Q.  That is what he said?
16 A.  Correct.
17 Q.  Did Mr. Shea tell you about any attempts
18     Mr. Ward had made to contact Mr. Shea?
19 A.  There were none.
20 Q.  That is what Mr. Shea said?
21 A.  Correct.
22 Q.  Did you try to contact Mr. Ward to verify
23     that?
24 A.  No.

SHEA COURT REPORTING SERVICES
(617) 227-3097

15

1  Q.  You just took Mr. Shea's word for it?
2  A.  Correct.
3  Q.  What, if anything, did you advise Mr. Shea
4      to do?
5  A.  Continue to keep contacting him.
6  Q.  Anything else?
7  A.  I don't recall anything else.
8  Q.  Did you give him suggestions on how to
9      contact Mr. Ward?
10 A.  We left notes -- I know he left notes at his
11     house, and I know he had another manager
12     with him.
13 Q.  Any other suggestions you gave Mr. Shea?
14 A.  Not that I can recall.
15 Q.  Did you learn -- were you aware or did you
16     learn at any time that Mr. Ward had applied
17     for FMLA leave?
18 A.  Yup.
19 Q.  How did you learn that?
20 A.  I think Mr. Shea told me.
21 Q.  What did he tell you in that regard?
22 A.  That he had put in -- he called to the ARC,
23     and that's all I remember.
24 Q.  You don't know what Mr. Shea told you that

SHEA COURT REPORTING SERVICES
(617) 227-3097

16

1      he had heard from the ARC?
2  A.  No.
3  Q.  Did you have any further conversations with
4      Mr. Shea about Mr. Ward?
5  A.  Really just about the letters that were
6      going out because he had not contacted his
7      boss.
8  Q.  So what is an employee supposed to do when
9      he is out sick on an extended leave for
10     medical reasons, is he supposed to contact
11     the ARC or his boss?
12 A.  Both.
13 Q.  Mr. Shea denied that Mr. Ward had contacted
14     him?
15 A.  Yes.
16 Q.  Did Mr. Shea report back to you on his
17     further attempts to contact Mr. Ward?
18 A.  We talked quite a few times.  I don't
19     remember how many, what dates.
20 Q.  So he told you he had made further attempts
21     to contact Mr. Ward?
22 A.  Yes.
23 Q.  He denied that Mr. Ward had made any
24     attempts to contact him?

SHEA COURT REPORTING SERVICES
(617) 227-3097

17

```
 1   A.   Correct.
 2   Q.   Did you give Mr. Shea further advice?
 3   A.   I think I told him to not only send the
 4        registered mail, but also post a copy at his
 5        house.
 6   Q.   Did Mr. Shea tell you he had done that?
 7   A.   Correct.
 8   Q.   He later told you he still had not heard
 9        from Mr. Ward?
10   A.   Um-hum.
11   Q.   You have to say yes.
12   A.   Yes.
13   Q.   He never told you that Mr. Ward contacted
14        him after he posted the notice at his house?
15   A.   Never.
16   Q.   Did you give Mr. Shea further advice?
17   A.   Well, the next step would have been the job
18        abandonment letter.
19   Q.   What is the job abandonment letter?
20   A.   That you're going to be terminated for job
21        abandonment.
22   Q.   Is that something that was made up
23        specifically for Mr. Ward, or is that
24        something that has been done in other cases?
```
SHEA COURT REPORTING SERVICES
(617) 227-3097

18

```
 1   A.   We use that in many cases.
 2   Q.   It happens all the time?
 3   A.   Not all the time, but it's used.
 4   Q.   With a company as big as Verizon, there's a
 5        certain number of employees that just
 6        abandonment their job without communicating
 7        with Verizon?
 8   A.   It's happened.
 9   Q.   You send them those letters?
10   A.   Correct.
11   Q.   To both union and non-union employees?
12   A.   Correct.
13   Q.   This was standard operating procedure, then,
14        that the letter be sent?
15   A.   Um-hum, yes.
16   Q.   What's the letter say, in so many words?
17   A.   Basically -- I don't recall the letter
18        itself.  It just basically says being
19        terminated due to job abandonment, that is
20        all I remember.
21   Q.   This isn't a final warning, this is actually
22        a termination letter?
23   A.   Correct.
24   Q.   Who made the decision that Mr. Ward should
```
SHEA COURT REPORTING SERVICES
(617) 227-3097

19

```
 1        get this termination letter?
 2   A.   That, again, would have been run by that
 3        Juliette Patterson that I referred to
 4        before, which is the committee that looks
 5        at issues to make sure that we are
 6        consistent across the corporation.
 7   Q.   Do you know who Mr. Reed is?
 8   A.   Yes.
 9   Q.   Did you discuss this with Mr. Reed?
10   A.   Mr. Reed, for most of this, was on vacation,
11        and I don't recall when he came back and
12        got back into the mix.
13   Q.   Is it fair to say, then, that you made the
14        decision to discharge Mr. Ward?
15   A.   No.
16   Q.   Who made the decision to send him the
17        letter?
18   A.   Who made the decision to send him a letter?
19   Q.   The termination letter.
20   A.   Well, the direct -- who signed it?
21   Q.   Mr. Shea signed it, but his testimony was
22        that the letter went out at Verizon's
23        direction.  I am asking you who made the
24        decision that the letter go out,
```
SHEA COURT REPORTING SERVICES
(617) 227-3097

20

```
 1        irregardless of who signed it?
 2           MR. TELEGEN:  Objection.  I think
 3        you may actually have misled the witness.
 4           MR. MANOFF:  Right, right.  You're
 5        correct.  I am mixing up letters now.
 6   Q.   Irregardless of who signed it, that is not
 7        what I am interested in.  We can look it up,
 8        it's a matter of record here.  Irregardless
 9        of who signed it, who made the decision to
10        send it out?
11   A.   Who made the decision to send it out?  It is
12        approved by that group I referred to
13        previously.
14   Q.   It's approved by whom, by Juliette
15        Patterson?
16   A.   Correct.
17   Q.   Did she make the decision to send the letter
18        to Mr. Ward?
19   A.   She would approve the department's request
20        to send the letter to Mr. Ward.
21   Q.   Who in the department made the request to
22        send the letter to Mr. Ward?
23   A.   Nobody requested.  They asked the opinion of
24        what we would do in a situation like that,
```
SHEA COURT REPORTING SERVICES
(617) 227-3097

**21**

1      and that would be the decision.
2   Q. Who asked the opinion?
3   A. Mike Shea.
4   Q. Mr. Shea asked you, "What do we do in a case
5      like this --
6           (Witness nodding her head
7      affirmatively.)
8   Q. You have to answer yes.
9   A. Yes.
10  Q. -- where persons abandon their jobs and
11     refuse to communicate with me?"
12  A. Yes.
13  Q. What did you tell Mr. Shea?
14  A. That we would send the letter giving him a
15     date to come back or contact his boss.
16  Q. After that letter was sent to him and not
17     responded to, according to Mr. Shea, who
18     made the decision to send the termination
19     letter?
20  A. I said, "The next step would be the job
21     abandonment letter."
22  Q. So you told Mr. Shea, then, that Verizon
23     would send a job abandonment letter?
24  A. Correct.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**22**

1   Q. So you made the decision to send that
2      letter?
3   A. Then I verified it through the group to make
4      sure that was the right step to take.
5           MR. TELEGEN: Objection.
6   Q. How did Mr. Reed come to sign the letter?
7   A. I don't recall.
8   Q. Did you speak to Mr. Reed about this?
9   A. When he came back from vacation, yes.
10  Q. Did he sign the letter before or after he
11     came back from vacation?
12  A. I don't recall.
13  Q. What conversation did you have with Mr. Reed
14     about sending out the termination letter?
15  A. I don't really have a lot of recollection of
16     the conversation.
17  Q. So you have no recollection of the
18     conversation?
19  A. Not really.
20  Q. If Mr. Shea had told you that Mr. Ward had
21     attempted to contact him several times,
22     would you have approved of sending out the
23     termination letter?
24  A. No.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**23**

1   Q. At the time the termination letter was
2      authorized by you and Juliette Patterson,
3      did you know that Mr. Ward had been to ARC,
4      had contacted ARC with respect to trying to
5      get FMLA leave?
6   A. Yes.
7   Q. Is that something Shea told you or something
8      you knew because you contacted ARC?
9   A. Shea told me.
10  Q. Did you do anything to verify Mr. Ward's
11     status with ARC?
12  A. Nope.
13  Q. Why not?
14  A. Why not?
15  Q. Yeah.
16  A. He didn't call his boss.
17  Q. According to the boss.
18  A. Right.
19  Q. But Mr. Shea doesn't grant FMLA leave, does
20     he?
21  A. No, he does not.
22  Q. So if -- who grants the FMLA leave?
23  A. I don't know.
24  Q. Was it somebody at ARC?

SHEA COURT REPORTING SERVICES
(617) 227-3097

**24**

1   A. I would assume.
2   Q. So if ARC had granted FMLA leave during this
3      time, would Mr. Ward still have been
4      terminated?
5   A. He never contacted his boss.
6   Q. Well, all right. Let's assume that Mr. Shea
7      told you he never contacted his boss and
8      that was correct, but if ARC had granted him
9      FMLA leave, would he still have been sent
10     the termination letter?
11  A. Probably.
12  Q. That's because you say he didn't contact the
13     boss?
14          (Witness nodding her head
15     affirmatively.)
16  Q. You have to answer.
17  A. Yes.
18  Q. So you say it's the employee's duty to both
19     contact the boss and ARC if he's seeking
20     FMLA leave?
21  A. That's correct.
22  Q. How is the employee notified of that
23     requirement?
24  A. It's known.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**1**

Pages: 1-34
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A.#: 1228-RCL

* * * * * * * * * * * * *

DANIEL WARD,

    Plaintiff

VS.

VERIZON CORPORATION and MICHAEL B. SHEA,

    Defendants

* * * * * * * * * * * * *

DEPOSITION OF JOHN REED, a witness called by and on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Joan Applegate, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Paul Manoff, Esq. 47 Winter Street, Boston, Massachusetts, on Tuesday, October 26, 2004 commencing at 2:30 p.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

**2**

APPEARANCES:

Paul Manoff, Esq.
47 Winter Street
Boston MA 02108
On behalf of the Plaintiff;

Arthur G. Telegen, Esq.
Matthew L. Adams, Esq.
Foley, Hoag, LLP
155 Seaport Boulevard
Boston MA 02210-2600
On behalf of the Defendants.

ALSO PRESENT:

Daniel Ward, Plaintiff
Michael Shea, Defendant

SHEA COURT REPORTING SERVICES
(617) 227-3097

**3**

I N D E X

DEPONENT

  John Reed

EXAMINATION         PAGE

  (By Mr. Manoff)      4

E X H I B I T S

NO.    DESCRIPTION    PAGE

None

SHEA COURT REPORTING SERVICES
(617) 227-3097

**4**

S T I P U L A T I O N S

    It is hereby stipulated and agreed by and between counsel for the respective parties that the sealing, filing, and certification of the deposition are waived.

    It is further stipulated and agreed by counsel that all objections, except as to the form of the question, are reserved until the time of trial. Motions to strike are reserved until the time of trial or other evidentiary use of the transcript.

    The witness exercises his right to read the transcript and sign the original signature page under the pains and penalties of perjury. If the transcript is not signed within 30 days of receipt thereof, it is deemed accurate.

    JOHN REED, having duly affirmed that his testimony would be the truth, the whole truth, and nothing but the truth, testified as follows in answer to direct interrogatories:

BY MR. MANOFF:

Q.  Please state your name, sir.

SHEA COURT REPORTING SERVICES
(617) 227-3097

25

1      ARC or is he supposed to notify his own
2      supervisor?
3  A.  He has to notify both.
4  Q.  Both. Is that written down anywhere?
5  A.  Oh, I don't know.
6  Q.  If Mr. Ward had been in touch with Mr. Shea
7      during this period of time, would he have
8      been fired if he told Mr. Shea that he's
9      very sick and under a doctor's care and he's
10     seeking FMLA leave? Would he be fired?
11 A.  Gracious, no, I don't believe he would be.
12 Q.  So the real issue is he wasn't in touch with
13     Mr. Shea?
14 A.  I guess the real issue is he didn't report
15     to work, nor was he in touch with Mr. Shea
16     or anybody else.
17 Q.  Did you know that he had contacted ARC?
18 A.  I didn't know that, no.
19 Q.  Mr. Shea didn't tell you that?
20 A.  He did at some stage, but I think it was
21     afterwards.
22 Q.  After Mr. Ward was fired?
23 A.  Yeah, I believe.
24 Q.  And so you had no idea that Mr. Ward was

SHEA COURT REPORTING SERVICES
(617) 227-3097

26

1      claiming to be ill and under a doctor's care
2      and out of work?
3  A.  No, I did not.
4  Q.  You never contacted ARC yourself?
5  A.  No, I did not.
6  Q.  Because you didn't have any reason to?
7  A.  No. In fact, I wasn't even here.
8  Q.  You were on vacation?
9  A.  I was on vacation. I was in a conference
10     and on vacation in Florida.
11 Q.  How long were you on vacation?
12 A.  I was gone 12, 14 days.
13 Q.  Were you in touch with Mr. Shea by phone
14     during this vacation?
15 A.  No.
16 Q.  So did you have any role in terminating
17     Mr. Ward?
18 A.  The role I had was when I came back off
19     vacation I was taking the recommendation
20     from the human resources, their letter and
21     signing the letter, making sure with Mike.
22     I did discuss with Mike, obviously, "Mike
23     have we done everything we possibly can?
24     Send letters try to find him?" blah, blah,

SHEA COURT REPORTING SERVICES
(617) 227-3097

27

1      blah, and the answer was "Yes."
2  Q.  So in other words, you had no conversation
3      about Mr. Ward when you were on vacation?
4  A.  No.
5  Q.  At the time you returned from vacation, the
6      decision had already been made to terminate
7      Mr. Ward?
8  A.  Yeah. The recommendation had been made to
9      terminate him.
10 Q.  Human resources approves of that, as far as
11     you knew?
12 A.  Yes.
13 Q.  How did you learn that the recommendation
14     had been approved?
15 A.  Had been approved?
16 Q.  Yes. The termination letter went out under
17     your signature?
18 A.  Right.
19 Q.  How did you know you were supposed to do
20     that?
21 A.  Oh, I'm sorry. I didn't understand the
22     question at first.
23 Q.  You said you got back from vacation, the
24     decision had already been made. How did you

SHEA COURT REPORTING SERVICES
(617) 227-3097

28

1      know that you were --
2  A.  When I say "the decision had been made," the
3      decision to review the case had been made
4      and said, "Fine, you can go forward if you
5      choose to." I made the final decision to
6      send the letter and signed it.
7  Q.  Who provided you information that you
8      utilized in making that decision?
9  A.  Mike, Mr. Shea.
10 Q.  Anybody else?
11 A.  Mary O'Leary.
12 Q.  What did Mary O'Leary tell you?
13 A.  That she had done everything she could do
14     from her standpoint, and that it was
15     appropriate to go forward.
16 Q.  Did she say whether she had made any
17     attempts to contact Mr. Ward?
18 A.  I don't recall.
19 Q.  So as far as you know, the only one who
20     made any attempts to contact Mr. Ward was
21     Mr. Shea himself?
22 A.  I don't know.
23 Q.  Well, did anyone else, as far as you know,
24     make an attempt to contact Mr. Ward?

SHEA COURT REPORTING SERVICES
(617) 227-3097

## 29

1  A.  I don't know.  I don't know.

2  Q.  Mr. Shea told you that he had tried to

3      contact Mr. Ward, but Mr. Ward didn't get

4      back to him?

5  A.  Yes, he told me that.

6  Q.  Is there anybody else who told you that,

7      that Mr. Shea had been trying to contact

8      Mr. Ward and Mr. Ward hadn't got back to

9      him?

10  A.  I don't know.

11  Q.  You just took Mr. Shea's word for it?

12  A.  I asked -- yes, in a way.  I asked Mike a

13      lot of questions.  "How many times have you

14      tried to contact him?  How did you do it?

15      Did you send register letters?"  In fact, I

16      remember Mike running out there.  I remember

17      saying, "Paste it to his door if you have

18      to."

19  Q.  You didn't ask anyone else to contact

20      Mr. Ward?

21  A.  No.  Well, I take that back.  At one time I

22      did call the head of security and said,

23      "This is what we have done.  This is what

24      Mike has done.  What is your

SHEA COURT REPORTING SERVICES
(617) 227-3097

## 30

1      recommendation?"

2  Q.  What did the head of security say?

3  A.  "You have done everything that we would do."

4  Q.  If you had known that Mr. Ward had contacted

5      Mr. Shea numerous times and left messages

6      and Mr. Shea hadn't returned the phone

7      calls, would Mr. Ward still have been fired?

8           MR. TELEGEN:  Asked and answered,

9      but go ahead.

10  A.  If I had known --

11  Q.  -- that Mr. Ward tried to contact Mr. Shea

12      several times, spoke to him during this

13      period, and Mr. Shea didn't return his phone

14      calls, would you still have allowed Mr. Ward

15      to be discharged?

16  A.  I don't know what I would have done in that

17      situation.

18  Q.  Excuse me?

19  A.  I don't know what I would have done in that

20      situation.

21  Q.  But basically you took Mr. Shea's word for

22      the fact that Mr. Ward hadn't made any

23      attempt to contact him?

24  A.  That's correct.

SHEA COURT REPORTING SERVICES
(617) 227-3097

## 31

1  Q.  Based on Mr. Ward's alleged failure to

2      contact Mr. Shea and let him know what his

3      status was, you approved of Mr. Ward being

4      terminated?

5  A.  Yes.

6  Q.  Any other reason he was terminated?

7  A.  Excuse me?

8  Q.  Any other reason he was terminated?

9  A.  The reason he was terminated was not showing

10      up for work and not calling in.

11  Q.  Anything else?

12  A.  No.

13  Q.  Did you ever hear from Mr. Shea his theory

14      of why Mr. Ward was absent?

15  A.  No.

16  Q.  No?

17  A.  I don't believe -- well, I don't even

18      believe Mike knew, had a clue why.

19  Q.  Did Mr. Shea say anything to you about any

20      problems Mr. Ward had with his pipes?

21  A.  I do recall Mike saying that initially,

22      early February, he had something to do with

23      his pipes, yes.

24  Q.  What did he say about that?

SHEA COURT REPORTING SERVICES
(617) 227-3097

## 32

1  A.  All I knew is he had to do something with

2      his pipes.  I am not even sure what pipes

3      he's talking about.

4  Q.  You don't have any more memory than that?

5  A.  No.

6  Q.  Did you make any attempt at all to verify

7      the information Mr. Shea was giving you?

8  A.  Verify information that was given to me?

9  Q.  Did you try to contact Mr. Ward yourself?

10  A.  No, I did not.

11  Q.  Did you ask anyone else to try to contact

12      Mr. Ward?

13  A.  No.

14  Q.  You just took Mr. Shea's word for it?

15  A.  Correct.

16           MR. MANOFF:  No further questions.

17      Do you want to question this witness?

18           MR. TELEGEN:  No, I don't.  Thank

19      you very much.

20           (Whereupon the deposition was

21      concluded at approximately 2:55 p.m.)

22

23

24

SHEA COURT REPORTING SERVICES
(617) 227-3097